## ROOT *v.* THIRD AVENUE RAILROAD COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 39. Argued November 7, 1892. — Decided November 21, 1892.

An inventor applied, September 3d, 1881, for letters patent for an "improvement in the construction of cable railways," the invention consisting in the employment of a connecting tie for the rails, and supports for the slot irons, by which both are rigidly supported from the tie and united to each other, the ties or frames being embedded in concrete, and the rails, the slot irons and the tube being thus connected in the same structure. The invention was conceived in 1876, and used by the inventor in constructing a cable road, which was put into use in April, 1878, and of which he was superintendent until after he applied for the patent, which was granted in August, 1882; *Held*, on the facts,

(1) The use of the invention was not experimental;

(2) The inventor reserved no future control over it;

(3) He had no expectation of making any material changes in it, and never suggested or made a change after the structure went into use, and never made an examination with a view of seeing whether it was defective, or could be improved;

(4) The use was such a public use as to defeat the patent;

(5) The case of *Elizabeth v. Pavement Co.,* 97 U. S. 126, considered, and the present case held not to fall within its principles.

THIS was a suit in equity, brought July 12, 1886, in the Circuit Court of the United States for the Southern District of New York, by Henry Root against the Third Avenue Rail-

road Company, founded on the alleged infringement of letters patent No. 262,126, granted August 1, 1882, to the plaintiff, for an "improvement in the construction of cable railways," on an application filed September 3, 1881.

The specification of the patent said : "My invention relates to cable railways, and it consists in the employment of a connecting tie for the rails, and supports for the slot irons, by which both are rigidly supported from the tie and united to each other. In combination with this construction I employ a substratum of concrete or equivalent material, which will set or solidify and unite the whole into a continuous rigid structure, no part of which is liable to be displaced from its relation to the other, and also provide a support for the roadway. Previous to my invention all cable railways had been constructed of iron ribs of the form of the tube, set at suitable intervals, to which the slot iron or timber, as the case may be, was bolted and the spaces between these ribs filled with wood, to form a continuous tube. Outside and independent of this tube the rails were laid, supported on short ties or other foundations, and were connected horizontally with the iron ribs by short bolts or rods, but were liable to settle by the undermining of their foundation without regard to the tube or the other rail of the track. This would frequently occur by the renewal of the paving outside of the track, the introduction of house connections with the main sewer, or other disturbances of the street. This settling would cause great inconvenience, as the gripping apparatus, which is carried by the rail through the medium of the car or dummy, must travel in a fixed position in the tube, thus making a frequent adjustment of the rails to the tube necessary. The space between the rails and sides of the tube was filled with sand, which could not be securely confined, as the joints in the tube were liable to open by settling, so as to require a frequent relaying of the paving or planking and making the whole insecure and expensive to maintain. In my invention the whole forms a single rigid structure."

The following were the drawings of the patent, Figure 1 being a cross-section and Figure 2 a perspective view :

*Fig. 1.*

*Fig. 2.*

The specification said: "A is the main tie, bent so as to embrace the tube, and it has fastened to the ends suitably formed plates or chairs B, to which the rails G are fastened or, if stringers are used, they may be fastened directly to the

ties. The ties may be of various shapes, but in this case I have used old T-rail turned bottom up, with but one curve or bend, as this requires but one heat and is thus cheaper. C are upright supports for the slot irons, having one end secured to the tie at points each side of the bend, sufficiently separated to form the necessary width for the tube. D are tie-rods, connecting said supports with the main ties or frames, through the chairs, rails or stringers, as the case may be. The rods D may be fixed or may be screw-bolts having two nuts at one end for the adjustment of the slot irons to or from each other during construction, or other equivalent means may be employed. E is the concrete, in which the ties or frames are embedded at suitable distances to support the rails and slot irons, which form the top of the tube. This concrete forms a support for the iron-work, the bottom and sides of the tube, and a foundation for the paving F, which fills the space between the rails and slot iron, thus forming an even and durable roadway, which cannot settle below the level of the rails or slot irons or cause a side pressure on the tube, as is the case where the roadway is supported on sand or other independent foundation. As nearly all the weight of the traffic is on the rails, the tendency of the rails to go down is resisted by a deep girder, of which the bent tie forms the top and this continuous mass of concrete forms the bottom. I am aware that concrete, as a material for foundations, underground sewers and conduits, has long been well known, and that concrete, brick-work or ironstone pipe might be used to form the tube between the iron ribs, of the well-known construction, without any particular invention, as these materials are as well known as wood, but it would be still subjected to all the danger of unequal settlement, and the short tie and stringer of wood require frequent renewal and adjustment to the level of the tube. It will be seen that a distinguishing feature of my invention is the connecting of the rails in the same structure as the slot irons and the tube, so that all the parts are maintained in their relative position, and whatever may occur to alter the place of one will have no effect unless the change is sufficient to affect the whole structure." There are seven claims in the patent.

The answer set up in defence a denial of the allegation of the bill that the alleged invention was not in public use or on sale for more than two years prior to the application for the patent; and it alleged that the invention had been in public and profitable use in the United States for more than two years before the date of the application. It also set up want of novelty and non-infringement.

There was a replication to the answer, proofs were taken, and the case was brought to a hearing before the Circuit Court, held by Judge Wallace; and a decree was entered dismissing the bill. From that decree the plaintiff appealed.

The opinion of the Circuit Court, found in 37 Fed. Rep. 673, passed upon a single question. The invention was put into use on the California Street railroad, a cable road in the city of San Francisco, on April 9, 1878, the road having been built by the plaintiff and put into regular operation at that time, and, as constructed, having embodied in it the invention described in the patent. The defendant contended that such use was a public use of the patented invention more than two years before the application, and that, therefore, the patent was invalid. The plaintiff contended, below and here, that such use was an experimental use, and that the application was filed within two years after the plaintiff became satisfied that his invention was a practical success.

Section 4886 of the Revised Statutes, which was in force when this patent was applied for and issued, enacts that a patent may be obtained when the invention has not been "in public use or on sale for more than two years prior to the application"; and § 4920 provides that it may be pleaded and proved as a defence, in a suit at law or in equity on the patent, that the invention "had been in public use or on sale in this country for more than two years before" the application, or had been abandoned to the public.

From the time the cable road mentioned was put into operation, no change or modification was made in its plan or its details. In the summer of 1876, between May and the 1st of September, the plaintiff conceived the invention. Early in that year certain persons in California obtained a franchise for the

construction of a wire cable road on California Street in San Francisco, and the plaintiff was led to believe that he would be called upon, as an engineer, to construct the road. He immediately commenced studying up the matter, to be prepared to recommend a plan of construction, whenever called upon. He testified that he deemed it necessary in a cable road, to get a smooth, even roadway and track, and the tube or tunnel-way for the cable and its carrying machinery strong enough to resist any tendency toward the closing of the slot, to provide for the grip-shank, and to make a structure as a whole so permanent and durable as to stand the wear and jar of heavy street traffic, as well as of the car traffic which it was to carry; and that, for that purpose, he deemed it necessary to have a rib or yoke, with connections to the two rails and the two slot irons, so as to connect them permanently, such yoke to be embedded in and supported by a surrounding mass of concrete to form a support and foundation for the ribs or yokes, the bottom and sides of the cable tube or tunnel, and a foundation for the paving of the roadway. He said that he explained this invention to several persons prior to September 2, 1876, and on that day discussed the subject and explained the invention in a general way at a meeting of the directors of the proposed road. Between that time and January 1, 1877, he made a model containing two of the ribs, with an outside casing and cover, and had the space between filled in with concrete, encasing the skeleton ribs and forming "the shut section" of the completed track and tube.

His invention was adopted by the projectors of the railroad, and active work was commenced upon the structure in July, 1877. The road cost, with the equipment, $418,000, and is about two miles in length, the road-bed and tunnel construction having cost about $225,000. From April 9, 1878, it has been in regular and successful use as a street railroad, carrying passengers for pay. The plaintiff was superintendent of the road from that time until the date of his application for the patent, and afterwards until 1883.

In explanation of his delay in applying for the patent, he testified that before he began the construction of the road, one

of the projectors expressed a doubt in regard to the durability of such a structure, and a fear that the jar of street traffic, as well as that of the cars, would in time loosen the ribs and separate them from the surrounding concrete, and the structure would thus fail; that doubts were expressed also by others; that, while the plaintiff believed that there was more than an even chance of its proving a durable and desirable structure, he still had some doubt in his own mind, which was somewhat increased by the doubts expressed to him by others, in whom he had confidence; that, as causes which would contribute to the destruction of the road, there were (1) the moving of cars over a rail connected to iron-work without the intervention of any wood; (2) the street traffic of trucks and teams, to which such a structure would necessarily be exposed; (3) the changes of temperature; and (4) the effect of time, and the danger of water following down the different members of the iron-work, and the rust separating them from the concrete; and that there was no way of determining these matters but by a trial in a public street through a long period of time.

He was asked whether his own doubts as to the durability of the structure were present at any time after the road was in operation, and if so, when, and by what they were caused. He answered "Yes," and said that during the spring of 1879, the road was extended from Fillmore Street to Central Avenue, by a wooden structure not nearly so durable or costly as the original road; that, in preparing for the extension, he had occasion to dig out and around, so as to expose some of the old structure; that he saw therein some indication of the loosening of the yokes in the concrete; and that he had some little fear at that time that some trouble might arise in that respect. He further testified that the reason he did not apply for the patent within two years from the time when he first put the structure into use, was that, if it proved weak or undesirable, he did not want any patent; and he did not feel certain enough of that fact until the year 1881.

But it did not appear that he expressed his doubts to the projectors of the road, either before its construction was commenced, or during its construction, or while he remained its

superintendent after it was completed; or that he communicated to any one what he noticed during the spring of 1879, or that he entertained any fear arising therefrom.

*Mr. Frederic R. Coudert* (with whom was *Mr. Charles Frederic Adams* on the brief) for appellant.

The invention was not, within the meaning of the statute, "in public use" for more than two years before Root's application for a patent.

The evidence is unquestionable as to the fact that Root intended this road as an experimental one, and that it was not such a structure as at that time could at once have been known to be a satisfactory construction. It was impossible to test this device except by putting it into practical use. The cost of this practical experiment does not enter the question, as it could not be tested unless a road was actually constructed upon which would be received all the strains due to traffic, etc., by which alone it could be tested. *Elizabeth* v. *Pavement Co.*, 97 U. S. 126.

The respondents have shown in their proof that this patent in suit was involved in an interference. During that interference the question arose which is now taken as defence by respondents, and the Patent Office decided that the use upon the California Street road was an experimental use and such a use as the nature of the invention required.

The "use" of Root's invention in the California Street railroad, upon which the learned judge below rested his decision, was not the sort of "public use" intended by the statute, inasmuch as it was not such a use by the public (as distinguished from a use in public) as is obnoxious to the policy of the statute, implying an abandonment or dedication of the invention to the public, and being therefore likely to mislead the public into assuming that the use of the device was free to all.

"It is settled that a merely experimental use, made in good faith, and not in such wise as to amount to a fraud upon the public, misleading them into a use, in the belief that it is free,

does not destroy the exclusive right of an inventor." *Sisson* v. *Gilbert*, 9 Blatchford, 185. See also *Adams* v. *Edwards*, 1 Fish. Pat. Cas. 1; *Locomotive Truck Co.* v. *Pennsylvania Railroad*, 1 Bann. & Ard. 470.

For the purposes of this question the only "use" of the invention in the California Street road — save in the sense in which it might be said that Root himself was there "using" the device by way of test and experiment — was by the company that owned the road. That that company transported passengers generally, by means of this cable road, does not in any relevant sense constitute those passengers, *i.e.* "the public," the users of the invention itself, as such.

Under the circumstances which here existed nothing can be clearer than that Root's permitting that corporation to use his system as it did in no sense implied or involved a "public use" of the invention, or such an "action or attitude" upon his part with reference thereto, as could fairly be deemed likely to "mislead" the public into supposing that the invention had been abandoned and dedicated, and into acting "on the belief that it was free." For Root, as the regularly employed engineer of the company, in full charge of the construction and at least technical management of its road, was far too closely identified with the company, in respect of the use of his invention, to allow his licensing the employment of his system in that instance to bear even the most remote implication that "the public" was "free to use" the improved device he had originated.

To him, under the circumstances, the California Street corporation was not "the public," or a part of the public, but, on the contrary, a capitalist partner, by whose aid alone he could experimentally test and develop his conception in the only way in which, in view of the nature and uses of the thing invented, such experimental test and development were practicable, *i.e.* by the actual use of the device in an actual road actually carrying such passengers as might offer.

The fact that fares were collected from passengers upon this road (which road we have thus seen to be, in a very relevant and very real sense, an experiment upon the part of

both Root and the company) seems to have been the determining circumstance against us in the mind of the learned Judge. He seems to have assumed that that in itself was proof that the "use" of the California Street road was not a use ".substantially for experiment," but a use "substantially for profit"; and, having assumed this, he easily concludes that we are not protected by the principle laid down by this learned court in the *Smith & Griggs Case* (123 U. S. 249), that the receipt of profits is not incompatible with a "substantially experimental" use.

The fact is, of course, that since the principle is that even the regular receipt of profits from the use will not render the invention unpatentable, provided only that the "use" from which such profits are received is "substantially experimental in character," the question whether this proviso is complied with in a given case must be determined by some other (and better) test than that afforded by the receipt of profits. An adequate, effectual trial and testing of Mr. Root's invention practically involved its embodiment and operation in the manner and on the scale in and on which it was embodied and operated in the California Street road; and this being so, and Mr. Root's backers having been willing to risk their capital in the experiment, there was no reason in law or policy why the experiment should not be thus made, or why, when it was so made, the operation of the system which was required for adequately testing it should not have been allowed, at the same time, to secure for the investors the return or "profit" which the passengers who happened to be served by the carrying on of the experiment were willing to pay for the accommodation.

With all respect to the learned Circuit Judge, we submit that the principles recognized by this court in the *Nicholson Pavement Case*, 97 U. S. 126, fully established the patentability of Root's invention, notwithstanding its embodiment in the California Street road.

As to the necessity of complete and public use in experimenting, the cable road is even stronger than the pavement. The latter can be much less in extent than the former. It

would not be possible to experiment with any but a complete cable road. A block or two or three blocks would not answer; for it would not be practicable to run cars regularly and constantly over such a short section, the city would not permit such a road nor such an experiment, nor could any one be induced to undertake it. It becomes evident, therefore, that, conceding a desire to experiment, a full-length, practically operating, cable road upon a public highway would be necessary.

A pavement might well sustain the stress of public traffic for a year or two, or the road-bed support the superstructure of a railroad for a like period; but if, at the end of two or three years, they should fail through inherent weakness, or wear out, they would be of absolutely no commercial value. Durability, of all qualities, is the *sine qua non* of such structures; without it they are worthless, and the same criterion should not be applied to them as to a machine for making a staple article, such, for example, as buckles.

This point should be kept in mind, in comparing this case with the *Smith & Griggs Case*, 23 U. S. 249.

See also the following cases: *Railway Register Co.* v. *Broadway &c. Railroad*, 26 Fed. Rep. 522; *Beedle* v. *Bennett*, 122 U. S. 71; *Graham* v. *McCormick*, 11 Fed. Rep. 859; *S. C.* 10 Bissell, 39; *Campbell* v. *New York City*, 9 Fed. Rep. 500; *Sinclair* v. *Backus*, 4 Fed. Rep. 539; *Campbell* v. *James*, 17 Blatchford, 42; *Birdsell* v. *McDonald*, 1 Bann. & Ard. 165; *Jones* v. *Sewall*, 6 Fish. Pat. Cas. 343; *Winans* v. *N. Y. & Harlem Railroad Co.*, 4 Fish. 1.

*Mr. Edmund Wetmore* (with whom was *Mr. Herbert Knight* on the brief) for appellee.

MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

The Circuit Court truly says, in its opinion: "Manifestly the complainant received a consideration for devising and consenting to the use of an invention which was designed to be a

complete, permanent structure, which was to cost a large sum of money, and which he knew would not meet the expectation of those who had employed him, unless it should prove to be in all respects a practically operative and reasonably durable one. If he had entertained any serious doubts of its adequacy for the purpose for which it was intended, it would seem that he would not have recommended it in view of the considerable sum it was to cost. At all events, he did not treat it as an experimental thing, but allowed it to be appropriated as a complete and perfect invention, fit to be used practically, and just as it was, until it should wear out, or until it should demonstrate its own unsuitableness. He turned it over to the owners without reserving any future control over it, and knowing that, except as a subordinate, he would not be permitted to make any changes in it by way of experiment ; and at the time he had no present expectation of making any material changes in it. He never made or suggested a change in it after it went into use, and never made an examination with a view of seeing whether it was defective, or could be improved in any particular."

It is contended by the plaintiff that the principles recognized by this court in *Elizabeth* v. *Pavement Co.*, 97 U. S. 126, establish the patentability of the plaintiff's invention, notwithstanding its embodiment in the California Street railroad. But the Circuit Court held that the proofs in the present case did not show a use of the invention substantially for experiment, but showed such a public use of it as must defeat the patent. The court further said that the facts were in marked contrast with those in *Elizabeth* v. *Pavement Co.*, because there the use was solely for experiment.

In *Elizabeth* v. *Pavement Co.*, the original patent was granted in August, 1854. The invention dated back as early as 1847 or 1848. Nicholson, the inventor of the pavement in question in that case, filed a caveat in the Patent Office in August, 1847, describing the invention. He constructed a pavement, by way of experiment, in June or July, 1848, in a street near Boston, which comprised all the peculiarities afterwards described in his patent, the experiment being successful.

The pavement so put down in Boston in 1848 was publicly used for a space of six years before the patent was applied for; and it was contended that that was a public use within the meaning of the statute. This court, speaking by Mr. Justice Bradley, said that it was perfectly clear from the evidence that Nicholson did not intend to abandon his right to a patent, he having filed a caveat in August, 1847, and having constructed the pavement in Boston by way of experiment, for the purpose of testing its qualities; that he was a stockholder in, and treasurer of, the corporation which owned the road in Boston where the pavement was put down, and which corporation received toll for its use; and that the pavement was constructed by him at his own expense, and was placed by him there in order to see the effect upon it of heavily loaded wagons and of varied and constant use, and also to ascertain its durability and liability to decay. It was shown that he was there almost daily, examining it and its condition, and that he often walked over it, striking it with his cane. This court held that if the invention was in public use or on sale prior to two years before the application for the patent, that would be conclusive evidence of abandonment, and the patent would be void; but that the use of an invention by the inventor, or by any other person under his direction, by way of experiment and in order to bring the invention to perfection, had never been regarded as a public use of it; and it added: "The nature of a street pavement is such that it cannot be experimented upon satisfactorily except on a highway, which is always public. When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet

he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a *bonâ fide* intent of testing the qualities of the machine would be a public use within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent. It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute. Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. If it be a grist-mill, or a carding-machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour, or their wool into rolls, and still it will not be in public use, within the meaning of the law. But if the inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is with his consent put on sale for such use, then it will be in public use and on public sale, within the meaning of the law. If, now, we apply the same principles to this case, the analogy will be seen at once. Nicholson wished to experiment on his pavement. He believed it to be a good thing, but he was not sure; and the only mode in which he could test it, was to place a specimen of it in a public roadway. He did this at his own expense, and with the consent of the owners of the road. Durability was one of the qualities to be attained. He wanted to know whether his pavement would stand, and whether it would resist decay. Its character for durability could not be ascertained without its being subjected to use for a considerable time. He subjected it to such use, in good

faith, for the simple purpose of ascertaining whether it was
what he claimed it to be.   Did he do anything more than the
inventor of the supposed machine might do in testing his in-
vention ?   The public had the incidental use of the pavement, it
is true; but was the invention in public use, within the mean-
ing of the statute ?   We think not.  The proprietors of the road
alone used the invention, and used it at Nicholson's request,
by way of experiment.   The only way in which they could
use it was by allowing the public to pass over the pavement.
Had the city of Boston, or other parties, used the invention,
by laying down the pavement in other streets and places, with
Nicholson's consent and allowance, then, indeed, the invention
itself would have been in public use, within the meaning of
the law; but this was not the case.   Nicholson did not sell
it, nor allow others to use it or sell it.   He did not let it go
beyond his control.   He did nothing that indicated any intent
to do so.   He kept it under his own eyes, and never for a
moment abandoned the intent to obtain a patent for it.   In
this connection it is proper to make another remark.   It is
not a public knowledge of his invention that precludes the
inventor from obtaining a patent for it, but a public use or
sale of it.   In England, formerly, as well as under our Patent
Act of 1793, if an inventor did not keep his invention secret;
if a knowledge of it became public before his application for
a patent, he could not obtain one.   To be patentable, an
invention must not have been known or used before the appli-
cation; but this has not been the law of this country since the
passage of the act of 1836, and it has been very much qualified
in England.   *Lewis* v. *Marling*, 10 B. & C. 22.   Therefore, if
it were true that during the whole period in which the pave-
ment was used, the public knew how it was constructed, it
would make no difference in the result.   It is sometimes said
that an inventor acquires an undue advantage over the public
by delaying to take out a patent, inasmuch as he thereby pre-
serves the monopoly to himself for a longer period than is
allowed by the policy of the law; but this cannot be said with
justice when the delay is occasioned by a *bonâ fide* effort to
bring his invention to perfection, or to ascertain whether it

will answer the purpose intended. His monopoly only continues for the allotted period, in any event; and it is the interest of the public, as well as himself, that the invention should be perfect and properly tested, before a patent is granted for it. Any attempt to use it for a profit, and not by way of experiment, for a longer period than two years before the application, would deprive the inventor of his right to a patent."

We think that the present case does not fall within the principles laid down in *Elizabeth* v. *Pavement Co.* The plaintiff did not file a caveat, and there is no evidence that he did not intend to abandon his right to a patent. It does not appear that any part of the structure was made at his own expense, or that he put it down in order to ascertain its durability or its liability to decay, or that what he says he noticed in the spring of 1879 led him to make any further examination in that respect, or to test further the fear which he says he had at that time, or that what he then saw led him to think that the structure was weak or undesirable. It cannot be fairly said from the proofs that the plaintiff was engaged in good faith, from the time the road was put into operation, in testing the working of the structure he afterwards patented. He made no experiments with a view to alterations; and we are of opinion, on the evidence, that sufficient time elapsed to test the durability of the structure, and still permit him to apply for his patent within the two years. He did nothing and said nothing which indicated that he was keeping the invention under his own control.

In *Smith & Griggs Mfg. Co.* v. *Sprague*, 123 U. S. 249. 256, 257, it was said, Mr. Justice Matthews speaking for the court: " A use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incidens to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principle and not the incident must give character

to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment. Where the substantial use is not for that purpose, but is otherwise public, and for more than two years prior to the application, it comes within the prohibition. The language of § 4886 of the Revised Statutes is that 'any person who has invented or discovered any new and useful . . . machine . . . not in public use or on sale for more than two years prior to his application, . . . may . . . obtain a patent therefor.' A single sale to another of such a machine as that shown to have been in use by the complainant more than two years prior to the date of his application would certainly have defeated his right to a patent; and yet, during that period in which its use by another would have defeated his right, he himself used it, for the same purpose for which it would have been used by a purchaser. Why should the similar use by himself not be counted as strongly against his rights as the use by another to whom he had sold it, unless his use was substantially with the motive and for the purpose, by further experiment, of completing the successful operation of his invention?"

In that case, *Elizabeth* v. *Pavement Co., supra,* was cited with approval, and it was said (p. 264): "In considering the evidence as to the alleged prior use for more than two years of an invention, which, if established, will have the effect of invalidating the patent, and where the defence is met only by the allegation that the use was not a public use in the sense of the statute, because it was for the purpose of perfecting an incomplete invention by tests and experiments, the proof on the part of the patentee, the period covered by the use having been clearly established, should be full, unequivocal and convincing." The court came to the conclusion that the patentee unduly neglected and delayed to apply for his patent, and deprived himself of the right thereto by the public use of the machine in question; and that the proof fell far short of establishing that the main purpose in view, in the use of the machine by the patentee, prior to his application, was to perfect its mechanism and improve its operation.

So, too, in *Hall* v. *Macneale*, 107 U. S. 90, 96, 97, it was contended that the use there involved was a use for experiment; but the court answered that the invention was complete, and was capable of producing the results sought to be accomplished; that the construction, arrangement, purpose, mode of operation and use of the mechanism involved were necessarily known to the workmen who put it into the safes, which were the articles in question; that, although the mechanism was hidden from view after the safes were completed, and it required a destruction of them to bring it into view, that was no concealment of it or use of it in secret; that it had no more concealment than was inseparable from any legitimate use of it; and that, as to the use being experimental, it was not shown that any attempt was made to expose the mechanism, and thus prove whether or not it was efficient.

In *Egbert* v. *Lippmann*, 104 U. S. 333, 336, the court remarked: "Whether the use of an invention is public or private, does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, within the meaning of the statute, even though the use and knowledge of the use may be confined to one person."

Without examining any other of the defences raised, we are of opinion that the bill must be dismissed, for the reason stated by the Circuit Court.

*Decree affirmed.*