## COOPER v. ROBERTSON, Commissioner of Patents.

### No. 1362.

District Court, D. Maryland.
Jan. 31, 1930.

A. Miller Belfield, of Chicago, Ill., and Semmes, Bowen & Semmes, of Baltimore, Md., for plaintiff.

A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., and T. A. Hostetler and J. F. Mothershead, U. S. Patent Office, both of Washington, D. C., for defendant.

WILLIAM C. COLEMAN, District Judge.

This is a suit in equity brought under the provisions of section 4915 Revised Statutes (35 USCA § 63), whereby the plaintiff seeks to secure three design patents on three different fonts of type which the Commissioner of Patents refused to grant. The three fonts of type are known as Cooper Black, Cooper Old Style, and Cooper Italic, and each of them comprises from seventy-five to eighty different items, that is, a complete alphabet of capital, small, lower and upper case letters, characters, punctuation marks, and a complete set of numerals.

The Cooper Black application, No. 6262, was rejected by the Patent Office, an appeal was taken to the Court of Appeals for the District of Columbia, pursuant to the provisions of the statute, and there the action of the Commissioner of Patents was affirmed. The two remaining applications, namely, those covering Cooper Old Style (application No. 6784), and Cooper Italic (application No. 10689), after going through the Patent Office in the regular course of procedure and being rejected, were brought before this court by a supplemental bill of complaint, which the court allowed to be filed over the objection of the Commissioner of Patents, who claimed that these applications had not been the subject of an appeal to the Court of Appeals for the District of Columbia which, under the statute, he alleged, was a prerequisite to a proceeding of this nature. In taking this action, however, the court expressly reserved the right later to dismiss the supplemental bill, should it conclude that defendant's contention was correct. The supplemental bill further alleges that patents were allowed by the Patent Office in the regular course of procedure on two of the three fonts here involved, namely, Cooper Black and Cooper Italic, but that after such allowance the Commissioner of Patents interfered with the regular course of proceedings by arbitrarily exercising his authority, and preventing the actual issue of patents on these two allowed applications, and that also, by his hostile attitude, he prevented the securing of a patent on the other application.

The Commissioner, by way of answer, alleges, with respect to all three applications, that they have been anticipated by the prior art, and, in support of this, cites various references which he claims prove that the statutory bar of prior printed publication and public use precludes the granting of the patents; and, with respect to applications No. 6784 and No. 10689, as has already been pointed out, the Commissioner claims that, irrespective of any possible merit which they may have, this court is without jurisdiction to consider them, because no appeal has been taken from his decision to the Court of Appeals for the District of Columbia.

### COOPER OLD STYLE, APPLICATION No. 6784, AND COOPER ITALIC, APPLICATION No. 10689.

The court now concludes that it must sustain the objection of the Commissioner of Patents to the supplemental bill of complaint made on the ground that Cooper Old Style, application No. 6784, and Cooper Italic, application No. 10689, have not been the subject of an appeal to the Court of Appeals of the District of Columbia, because it concludes that such an appeal, under the statute applicable to this proceeding, is a prerequisite to this court's jurisdiction.

The rights of the present complainant are controlled by the language of section 9 of the Act of February 9, 1893 (27 Stat. 436) and of section 4915 of the Patent Laws as they stood prior to the amendment of March 2, 1927 (44 Stat. 1335 [35 USCA §§ 59 and 63]), because at the time that amendment became effective, namely, two months after its approval, the two applications here in question were pending before the Commissioner of Patents, and that amendment expressly provides (section 15) that "it shall not affect appeals then pending and heard before the examiners in chief or pending before the Commissioner of Patents or in the Court of Appeals of the District of Columbia, and that in all cases in which the time for appeal from a decision of the examiners in chief or of the Commissioner of Patents or for amendment or renewal of application had not expired at the time this Act takes effect, appeals and other proceedings may be taken under the statutes in force at the time of approval of this Act.

as if such statutes had not been amended or repealed." See 35 USCA § 7, note. The wording of this provision does not permit of a construction whereby it is left optional with the unsuccessful applicant whether to invoke the old or the new law. But even were this true, since the plaintiff, in his original bill, is relying, and can only rely, upon the old law, it is inconsistent by supplemental bill, to attempt to introduce entirely new subject-matter and thereby to invoke the remedy of a different law.

The procedure governing the present case is as follows Section 4909 (35 USCA § 57) gave the applicant an appeal from the decision of the Primary Examiner to the Board of Examiners in Chief; section 4910 provided, in case the applicant was dissatisfied with the decision of the examiners in chief, he might appeal to the Commissioner in person, and the Act of February 9, 1893 (35 USCA § 59, now superseded by section 59a), gave a further appeal, in both ex parte and interference cases, in the event of dissatisfaction with the decision of the Commissioner, to the newly created Court of Appeals of the District of Columbia, by providing as follows: "The determination of appeals from the decision of the Commissioner of Patents is vested in the Court of Appeals of the District of Columbia; and in addition, any party aggrieved by a decision of the Commissioner of Patents in any interference case may appeal therefrom to said court of appeals." Section 4915 (35 USCA § 63) provided that: "Whenever a patent on application is refused, either by the Commissioner of Patents or by the supreme court of the District of Columbia upon appeal from the commissioner, the applicant may have remedy by bill in equity; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof as the facts in the case may appear. * * *" Upon incorporation of this section into the Code, the words "Court of Appeals" were substituted for "Supreme Court" on the authority of the Act of February 9, 1893, above referred to.

It is to be noted that the Act of March 2, 1927 (35 USCA §§ 59a and 63), amended the law by providing that the remedy by a bill in equity, theretofore allowed, would only exist in the event that the applicant had not appealed to the Court of Appeals of the District of Columbia. The purpose of the 1927 amendment was to correct an anomalous and unsatisfactory result in the matter of appeals created by the statute as it stood prior to that time; namely, that, unless the Commissioner of Patents consented to be served in a district other than that of his official residence—the District of Columbia—the remedy of two appeals allowed to the applicant, namely, an appeal to the Court of Appeals of the District of Columbia and also by a bill in equity, amounted, in fact, to one and the same remedy, because the only suit in equity that could be prosecuted would be one in the courts of the District of Columbia, the highest court of which, namely, the Court of Appeals, would already have decided against him. See Canon v. Robertson, Commissioner (D. C.) 32 F.(2d) 295. The purpose and effect, however, of this amendment does not tend to clarify the precise question here presented, which is simply whether, under the law as it stood prior to this amendment, and as applicable to the present litigation, an applicant for a patent is permitted to resort to equity unless and until the remedy provided by appeal has been exhausted.

The question must be answered in the negative. When the distinction between the two classes of cases, namely, interference and so-called ex parte cases, was abandoned by the amendment of 1893, there was no longer any purpose in retaining the optional clause in the first sentence of section 4915; before that time this clause was, of course, necessary. We may, therefore, treat its retention as serving no purpose after the amendment. This is borne out by the construction that has been given to the section in an ex parte case prior to the amendment. For example, in Kirk v. Commissioner, 37 O. G. 451, decided by the Supreme Court of the District in 1886, an applicant for a patent in an ex parte proceeding brought a bill in equity without having taken an appeal to the Supreme Court of the District. The bill was dismissed on demurrer. The court said, page 451:

"The case of Kirk v. The Commissioner of Patents and Secretary of the Interior has been submitted upon briefs upon a demurrer to the bill, certified from the special term to be heard here in the first instance. The bill was filed against the Commissioner of Patents and the Secretary of the Interior for the purpose of obtaining a patent for certain claimed improvements in an invention alleged to have been made by one Samuel Strong, the complainant's assignor, which patent had been refused by the Commis-

sioner of Patents in the year 1874, and finally refused, as it appears, in the year 1875. It was an ex parte application, and at various intervals from that time down to the year 1885 there were irregular applications to successive Commissioners to review the action of the preceding Commissioner, and finally there was another application of the same sort made by Samuel Strong in the year 1885, which application is upon its face said to be made 'continuous.' What the meaning of that is it is difficult to understand. But, however that may be, the impediments that are in the way of the complainant for relief in the mode he has chosen are insurmountable.

"In the first place, it is quite apparent that according to the scheme of the patent law there are two classes of cases to which different remedies are applicable so far as the final action of the Commissioner is concerned. They are, first, the cases called 'cases of interference,' where the action of the Commissioner is final; and, secondly, the cases of ex parte applications, where his action is not final, but where an appeal lies to the Supreme Bench of the District of Columbia, by virtue of section 4911 Revised Statutes. After these respective remedies have been exhausted the patent law, in its supreme indulgence to the claims of inventors, by section 4915 of the Revised Statutes, allows a further proceeding by way of bill in equity. Now, it is manifest upon the reading of the entire statute, and especially section 4915, which thus gives the further redress, that the party must have exhausted before he applies for that ultimate redress each of the successive stages for the perfection of his application which are provided by law. So far as the interference is concerned the previous stages have been exhausted by the final refusal of the Commissioner; but so far as the ex parte application is concerned his redress is not exhausted until after he has taken an appeal from the decision of the Commissioner. Then only arises to him the right, which has arisen already in the interference case upon the decision of the Commissioner, to apply to a court of equity for relief by an original bill according to the terms of the said section."

The correctness of the construction of the law here adopted is further confirmed by numerous decisions in interference cases, holding that the Act of February 9, 1893, did not by implication repeal section 4915 of the Revised Statutes, and that the only effect of the later act was to require the applicant to exhaust his remedy by an appeal from the Commissioner's decision, before being entitled to proceed in equity. See Prindle v. Brown (C. C. A.) 155 F. 531; Dover v. Greenwood (C. C.) 143 F. 136; McKnight v. Metal Volatilization Co. (C. C.) 128 F. 51.

COOPER BLACK, APPLICATION NO. 6262.

We come, therefore, to the remaining application, namely, No. 6262, covering Cooper Black font of type, which was rejected by the Patent Office, and the rejection affirmed on appeal to the Court of Appeals of the District. This application was filed in the Patent Office on May 23, 1923. The history of the application is as follows. Pursuant to the customary procedure, it was first passed upon by the Primary Examiner in charge of design applications, who refused to allow it, and an appeal was taken to the Board of Examiners in Chief, consisting of three members. This board reversed the decision of the Primary Examiner, declaring that the references cited by him did not preclude the granting of the design patent for this font of type. Thereupon the Primary Examiner, upon application, was allowed to cite additional prior art references on the question of patentability. He again rejected the application on the new references, and the case was again appealed to the Board of Examiners in Chief, the same members sitting. This board, one member dissenting, affirmed the Primary Examiner, relying upon the prior art references which he cited in his re-examination of the application. Appeal was thereupon taken to the Commissioner of Patents, and upon his affirming the prior action of the Patent Office, an appeal was taken to the Court of Appeals for the District of Columbia, which court [57 App. D. C. 353, 23 F.(2d) 774] in turn affirmed the decision of the Commissioner. Upon the institution of the present suit, the Commissioner accepted service in the Maryland District, on the ground that the Court of Appeals for the District of Columbia had already passed upon the case, thus obviating any question of the right to sue the Commissioner in the Maryland District.

The section of the law applicable to the present suit, and under which plaintiff claims his right to a patent, is as follows (35 USCA § 73): "Any person who has invented any new, original, and ornamental design for an article of manufacture, not known or used by others in this country before his invention thereof, and not patented or described in any printed publication in this or any foreign country before his invention thereof, or more than two years prior to his application, and

not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law and other due proceedings had, the same as in cases of inventions or discoveries covered by section forty-eight hundred and eighty-six, obtain a patent therefor." A reproduction of the font in controversy follows:

ABCDEFGHIJKLMN
OPQRSTUVWXYZ&
abcdefghijklmnopqr
stuvwxyz
$1234567890.,';:?!-
*[]¢£—

• The history and description of the Cooper Black design for which plaintiff claims the right to patent protection are as follows: It appears that since 1911 Mr. Cooper, an artist specializing in letter designing, had lettered an individual style of black face type, which was greatly in demand and which was also widely imitated. Certain printers saw possibilities for a type of this nature, and requested Mr. Cooper to design "Cooper Black." He stated that he did not see much chance of reproducing in metal the accidentals of lettering without arriving at a tiresome effect which comes from the too frequent repetition of the same quirk and curve; that a part of the charm of a lettered page is due to the variety which cannot be avoided, even if the letterer would avoid it, but, as he claimed, that kind of variety was obviously impossible in a typed page. In designing the letters he determined to make them look as much like type as possible and as little like lettering, and he claims that, while in the faces there is a suggestion of lettering, that suggestion comes from the construction, that is, from the form of the letters, rather than from their execution. Aside from its extreme blackness, and original serif construction, Cooper claims for his type this decided distinction, namely, that the height of the lower case characters is considerably greater than the proportions considered standard, even with the shortened descenders. Its particular value and effectiveness is claimed to be in connection with big advertisements, in formal posters, broadsides, car cards, and the like. There is so little white in the letters themselves, that little is required between them, and for that reason letterspacing is claimed to be inadvisable from the fact that it makes a spot of each letter. The face permits, even invites, cramping. Therefore, compositors cannot expect easy legibility from it when used for "body" matter. In masses its main virtue is in its attention value. It is claimed that the designer of a font of type must provide for the endless and perhaps unforeseen combinations which are certain to occur; that, from the point of view of a printer's use of the type, the designer of type cannot be satisfied with the effect that he sees when he draws a line of his characters on a piece of paper, because he must remember that these characters will be used by the printer in combinations which make necessary every conceivable compromise in weight and shape, so that a line of type which the printer sets will be spaced naturally and pleasantly. In other words, the question is not one of drawing an alphabet which satisfies the designer in combinations in which they happen to fall at that time, but is a question of fitting these characters, one to another, so as to provide for any and all probable combinations. Herein, the plaintiff claims, lies the originality and therefore the patentability of the Cooper Black font, namely, in the font as a whole, each character carefully worked out to constitute a complete whole, each to harmonize with the other when arranged in any one of an infinite number of possible combinations.

■ At the outset it is proper to point out that the present proceeding is not in the nature of an appeal, but rather a trial de novo, with all the customary power of an equity court to hear the evidence fully and to make its own findings. Butterworth v. U. S., 112 U. S. 50, 5 S. Ct. 25, 28 L. Ed. 656; Model Bottling Machinery Co. v. Anheuser-Busch Brewing Association (C. C. A.) 190 F. 573; Clements v. Kirby (C. C. A.) 274 F. 575; Miehle Printing Press & Mfg. Co. v. Miller Saw Trimmer Co. (C. C. A.) 6 F.(2d) 417. [3-5] As a basis for a consideration of every suit of this kind, we start with three propositions against which there can be no valid argument. First, that the test of invention for design patents is the same as for mechanical patents. Smith v. Whitman Saddle Co., 148 U. S. 674, 13 S. Ct. 768, 37 L. Ed. 606; Whiting Mfg. Co. v. Alvin Silver Co. (C. C. A.) 283 F. 75. There must be originality, and the exercise of the inventive faculty to entitle an applicant to the benefit of the act, whether he apply for a mechanical or a design patent. In the former, there must be novelty and utility; in the latter, novelty and beauty. The exercise of the inventive or

originative faculty is a prerequisite. In short, there must be more than the exercise of the imitative faculty. The result must be in fact a new creation. Second, in designs, invention is measured by the appearance of the design as an entirety when judged by the taste and fancy of the average person. Gorham Co. v. White, 14 Wall. 511, 20 L. Ed. 731; Dobson v. Dornan, 118 U. S. 10, 6 S. Ct. 946, 30 L. Ed. 63; Dominick & Haff v. R. Wallace & Sons Mfg. Co. (C. C. A.) 209 F. 223; Ashley v. Weeks-Numan Co. (C. C. A.) 220 F. 899. That is to say, the fact that each separate element in a design is old does not negative invention which may reside in the manner in which the various elements are assembled, since it is the design as a whole and the impression which it makes upon the eye of the average individual which must be considered. Third, the statutory requirement that the design be "ornamental" means that the design must disclose at least a rudimentary æsthetic appeal. H. C. White Co. v. Morton E. Converse & Son Co. (C. C. A.) 20 F.(2d) 311; Id., 275 U. S. 547, 48 S. Ct. 85, 72 L. Ed. 419.

Before testing Cooper Black font of type by the above requirements, it is necessary first to consider whether a design for a font of type is in and of itself patentable subject-matter, within the meaning of the statute. The court has no hesitancy in answering this in the affirmative, and so it has been held. Keystone Type Foundry v. Wynkoop (D. C.) 239 F. 355. If the decision in Goudy v. Hansen, 247 F. 782 (certiorari denied 246 U. S. 667, 38 S. Ct. 336, 62 L. Ed. 930), rendered in 1917 by the Circuit Court of Appeals for the First Circuit, is to be taken as a decision directly adverse to the conclusion here reached, we can only say that we are unwilling to follow that decision in this respect. Certainly the dissenting opinion of Judge Brown in that case represents a clear statement of the considerations which underlie the precise question now before the court, which appears never to have been decided by the Supreme Court. Denial by that court of a writ of certiorari imports no expression of opinion upon the merits of the case, and therefore is in no sense equivalent to an affirmance of the decree sought to be reviewed. Hamilton Brown Shoe Co. v. Wolf Bros. & Co., 240 U. S. 251, 36 S. Ct. 269, 60 L. Ed. 629; United States v. Carver, 260 U. S. 482, 43 S. Ct. 181, 67 L. Ed. 361. The following excerpts from Judge Brown's opinion are particularly apposite (247 F. pp. 787–789):

"It seems to me that the designer's right to a design patent is complete when he has produced a drawing or model which is a complete guide to the artificer of the article of manufacture; and, though design relates to appearance, appearance to the eye of the copying artificer satisfies the requirements of the act, even though the artificer applies the design to a die, or a type face, not intended for direct observation on account of its beauty, but for reproduction. * * *

"As it is the embodiment of the design which gives such 'articles of manufacture' and such marketable products their principal value, is there any sufficient reason for denying to the designer the right to patent his design 'for an article of manufacture' of this class? Or must he claim his design for the article of manufacture which is the product of the die or similar instrument of reproduction of the design? * * *

"Having in mind the practical division between the work of designing and the work of manufacturing according to the design, and also the very important consideration that it is the appearance of the patented design which is to furnish to the manufacturer full direction as to the shape or configuration of his article of manufacture, it is quite obvious that the type founder who selects this patented design is led to do so by its appearance and artistic quality as exhibited in the patent drawing. He has received such full instruction as to enable him to manufacture an article which owes its chief value to what the patentee has exhibited to his eyes, and what he in turn exhibits to the eyes of his workmen as a guide to reproducing it in metal upon an instrument which may again reproduce it.

"The designer makes his design for the use of a manufacturer of type, who pays for it as a design. Whether he makes it up into type or not is immaterial. He has the sole right to make use of that design as a guide to his manufacture of type; and if another manufacturer follows that design as exhibited in the patent, he infringes as much as if he had copied it from the face of manufactured type.

"It seems to me erroneous to hold that, because a manufactured font of type is not ordinarily regarded as in itself possessing beauty, the design which was exhibited to the eye of the manufacturer, and which he chose as a pattern to exhibit to the eyes of his workmen as a guide in their work, and which he also exhibits to purchasers of type, to induce them to select his type in preference to

other type, should be held unpatentable, because the article in which the design is physically embodied is not looked at to see the design which was the pattern for its construction, and which it may at any time reproduce.

"If we regard the design as a thing apart from the type, as the completed work of the designer, as a thing which the type founder sees and selects, which the workman sees and follows, which the printer chooses in order to please those who like good printing, and which the infringer copies, though he may never have seen the face of his competitor's type, there should be no difficulty in concluding that the design patent relates to that appearance which is the contribution to the public which the law decrees worthy of recompense."

While not controlling, it is at least of considerable significance that the Patent Office in the present suit does not deny that a font of type is patentable subject-matter. The Patent Office could scarcely take any other position, in view of the history of type fonts as found in that office. It appears that since 1856, when the issuance of design patents on type faces or fonts commenced, similar patents have issued year after year in varying numbers, with the result that up until 1922, that is for a period of sixty-five years, a total of 843 patents of this kind were issued, or an average of about 13 per year. During the period from 1922 to 1929, two additional type font design patents were issued.

■ Returning then to the question as to whether or not the Cooper Black design meets the three requisites of the statute above given, we have first to answer the question, Does this design in fact represent invention, that is, is it a new creation or simply an imitation of the prior art? There is an abundance of testimony introduced by those experienced both as advertising designers and typographers, which is not contradicted by any witnesses similarly qualified to speak, that Cooper Black faces are entirely original in design and readily distinguishable by any one having the slightest training in the use of type; also, that the Cooper Black series is one of the most distinctive display letters now in use, and has taken the place, in a great many instances, of hand lettering both in advertising and direct mail pieces. However, the Patent Office and the Court of Appeals for the District of Columbia concluded that the general appearance of the letters in the design differed only in minor details from the letters of the prior art, and, in support of this, reliance was placed upon two references: First,

Defendant's Exhibit A, being page 269 of the Catalogue of American Type Founders Company, Old Style No. 2 type, particularly designed for and used by the Saturday Evening Post, and Defendant's Exhibit B, which is the word "Asbestone" occurring in an advertisement in the June 14, 1919, issue of the Scientific American. In addition to these two references, there have been introduced, in the present proceeding by the Commissioner, three other references which are advertisements comprising a number of words, but not a complete font of type. There is no claim of anticipation by any prior patents.

The court is forced to the conclusion that it becomes unnecessary to consider the similarity between certain letters found in the Cooper Black font and those in the various references, because the court believes that the primary contention of the plaintiff with respect to these references is controlling, namely, that they are not relevant because they illustrate only a few letters, and, by reason of their fragmentary character, are not capable, either singly or combined, of affording a basis for determining whether a complete alphabet of such letters could produce Cooper's design. What the plaintiff here seeks to procure a patent for is not the design represented by the seventy-seven characters—letters and numerals—embraced in his font of type when printed upon paper, but for any design which will be embodied by those letters and numerals in any of their combinations when applied to the metal blocks constituting a font of type. In short, we must regard the design as a thing apart from the type, that is, as the completed work of the designer, as something which the printer chooses in order to please his customers. The designer makes his design for the manufacturer of type who pays for it as a design. The Commissioner argues that in manufacturers' type catalogues, which display the largest style of advertisement types, only a few letters are usually shown, because these are deemed sufficient to indicate to the trade the appearance of the entire font. For commercial purposes this may doubtless be true, but the statutory requirements are more exacting. As plaintiff well points out, the type founders' catalogue or advertising sheet may show only a part of the entire font, but nevertheless the entire font exists and a prospective purchaser may see it in its entirety by applying to the manufacturer or his agent. For example, as has been pointed out, the word "Asbestone" supplies the printer with the capital letter "A," but with no more capital letters. It supplies him, to be sure, with

a few small letters, but these cannot be used in any relation to other letters than their relation to "Asbestone." A least, if they are, the harmony and scheme of Cooper Black is destroyed. Perhaps some other words besides "Asbestone" may be made up from the few letters in that word, but, if we seek to supply all the upper and lower case letters of the alphabet for universal use, we are immediately prevented from so doing.

Turning next to the second test which must be applied to the Cooper Black design, namely, the test of whether its appearance as a design in its entirety is distinctive, it follows from what has already been said that the Cooper Black design meets this requirement. Enough has been said to clearly demonstrate that the Cooper design considered as a whole is not disclosed by any of the references of the prior art. None of them discloses a complete font of type, but merely parts of fonts. As was said by the Circuit Court of Appeals for the Second Circuit in Dominick & Haff v. R. Wallace & Sons Mfg. Co., supra, 209 F. p. 224: "The policy which protects a design is akin to that which protects the works of an artist, a sculptor or a photographer by copyright. It requires but little invention, in the sense above referred to, to paint a pleasing picture, and yet the picture is protected, because it exhibits the personal characteristics of the artist, and because it is his. So with a design." And, in Ashley v. Weeks-Numan Co., supra, by the same Court, 220 F. p. 902: "The fact that each separate element in a patented design was old does not negative invention, which may reside in the manner in which they are assembled, since it is the design as a whole, and the impression it makes on the eye, which must be considered."

Thirdly, we now come to a consideration of the question as to whether the Cooper Black design is ornamental within the meaning of the statute, that is to say, whether it embraces a rudimentary æsthetic appeal. The Court of Appeals for the District of Columbia said that this design "may be arresting, and hence desirable for advertising purposes; but that does not meet the requirements of the statute." We cannot agree with this conclusion, because it is quite evident from the uncontradicted testimony of experienced artists and typographers that the Cooper Black has a rudimentary æsthetic appeal. They state that the type has the highest artistic merit, and that page advertisements composed in this type are strikingly beautiful and pleasing. As was said by Judge Hand in H. C. White Co. v. Morton E.

Converse & Son Co., supra, a case upon which the Court of Appeals of the District of Columbia purports to rely in its decision, 20 F.(2d) p. 312: "We recognize that in æsthetics there are no standards, and that the design need not please such sensibilities as we may personally chance to possess." •

Having thus concluded that the Cooper Black design for a font of type is in fact a "new," "original," and "ornamental" design in the sense that it has not been anticipated by the prior art through anything disclosed by the references cited, we may now properly turn to a consideration of whether there has been any other prior publication or use of this font of type such as to constitute a bar to plaintiff's right to a patent.

By the express language of the statute there are three separate conditions, proof of the existence of any one of which is a complete bar to the granting of the patent here sought, even though the other requisites of the statute may be fulfilled: (1) Knowledge or use of plaintiff's design by others in this country before the plaintiff invented it; (2) description of it in a printed publication in this or a foreign country before plaintiff invented it or more than two years before he applied for the present patent; and (3) public use or sale in this country for more than two years prior to such application.

Considering the above in the order stated, there is no evidence, nor in fact is there any claim, that the Cooper Black design was known or used in such manner as to be accessible to the public (for that is the interpretation to be placed upon the phrase of the statute "not known or used by others") prior to the time when Cooper invented this style of type, namely, some ten or twelve years before he made application for the patent.

Passing to the second question, namely, whether the design has been described in a printed publication in this or a foreign country before Cooper invented it, or more than two years before he applied for the present patent, the evidence does not disclose such publication, unless we treat the publication of the various advertisements containing not all of the type but merely fragments of it as a publication of the font design as a whole. This, however, we are not permitted to do, as has been seen from the decisions already referred to. There is no doubt that each of the words "Asbestone," "Clean Cut," "Your Printer" and "Butler Paper" were published more than two years prior to the filing of plaintiff's original application which was on May 23, 1923. It also appears that many oth-

er examples in various publications throughout the United States, of similar or greater age, are to be found embodying Cooper Black. But the court is of the opinion that none of the items of prior publication to which its attention has been directed can be considered publication of the design within the contemplation of the statute, since each one shows at most a mere fragment of the entire design. It is true that publication contemplated by the statute takes place if the complete design is put in circulation or offered to the public in any printed form. That is to say, printed manufacturers' catalogues circulated throughout the trade containing illustrations of designs, are "printed publications." Imperial Glass Co. v. Heisey & Co. (C. C. A.) 294 F. 267; Jeckmus v. Leviton (C. C. A.) 28 F.(2d) 812. But no such printed matter is shown to have been so offered prior to the latter part of 1921, that is, less than two years before plaintiff applied for his patent. A folder entitled "The Broadside" which was a specimen sheet showing examples of all of the sizes of each of the three Cooper fonts, namely, Cooper Old Style, Cooper Black, and Cooper Italic, with price quotations, was issued to the public in 1924 by Barnhardt Bros. & Spindler, type founders of Chicago, with whom Mr. Cooper had arranged for the production of his fonts. There is no evidence that this circular was issued prior to that year, and the court must assume as correct, in the absence of definite contradiction, the statement of Mr. Murray, general manager of Barnhardt Bros. & Spindler, that no public announcement respecting Cooper Black or in fact any of the Cooper family of type, occurred prior to August or September, 1921. It is true that, in two of the other exhibits introduced in evidence by plaintiff, general statements are made which, if standing alone, would indicate that Cooper Black was offered to the public by the printing trade as early as 1920. That is to say, in the August, 1924, number of The Inland Printer, in that magazine's department entitled "Job Composition," there appeared an article entitled "Popular Types—Their Origin and Use. No. 11—The Oswald Cooper Faces," in which the following statement is to be found: "Cooper's types, founded by Barnhardt & Spindler, are the Cooper Old Style brought out in 1919; the Black in 1920 and the Cooper Italic, which has only recently been cast." Likewise in "American Type Design in the Twentieth Century," by Douglas C. McMurtrie, published by Robert Ballou in Chicago in 1924, there is to be found, on page 57, a specimen of Cooper Black with

this explanatory statement: "Some advertisers require exceptionally bold and black types. Personally, I do not see the necessity for them even to obtain smashing display. Of that kind of type, however, Cooper Black, a type of the vintage of 1920, is a good example." These statements, if standing alone, might be conclusive, but the court is unwilling to adopt them in the fact of what must be assumed to be the more authentic and, therefore, the more reliable statement, of Mr. Murray, the type founder whom Cooper employed to manufacture and promote his design. It is true there is no definite statement from Cooper as to exactly when he understood Cooper Black was first made accessible to the public, but we have from Mr. Murray the following, in answer to the question as to when he began putting the Cooper type faces on the market, which is to be taken as conclusive: "In the latter part of 1921; about August or September, 1921, we began putting out the first pieces of advertising matter showing Cooper Old Style. The type founding on these faces took considerable time and although the Cooper Old Style was the first design finished, we held that up to some extent in order that it might go out to the public at about the same time as the Cooper Black series, for which advertising matter soon followed. The Italic came out some time later, as its design was not completed until about 1923."

Lastly, what has just been said with respect to prior publication answers the question of prior public use or sale, there being no evidence that such occurred more than two years prior to plaintiff's application. Therefore, resort to this argument as a statutory bar must also fail. It is true, as we have seen, that there is no reason to make a different rule with respect to the patentability of a design and of a mechanical device. Nor does the question, whether the use of an invention is public or private, depend upon the number of times it is used, or upon the number of persons to whom its use is known. If an inventor, having made his device or design, gives or sells it to another without restriction for use by him or injunction of secrecy, and it is so used, such use is public, even though it, and knowledge of it, may be confined to one person. We further recognize that the use may be public, although concealed by the nature of the invention itself; and, further, that the use of a single specimen, even in a factory and in the presence only of the employees, may be public. Such use, however, is to be distinguished from one which, even though open to public view, is

made in good faith solely to test the qualities of invention, that is, for experimental purposes only. Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755; Root v. Third Ave. R. R. Co., 146 U. S. 210, 13 S. Ct. 100, 36 L. Ed. 946; A. Schrader's Sons Inc. v. Wein Sales Corp. (C. C. A.) 9 F.(2d) 306. The latter seems to have been the exact character of the only use to which Cooper allowed his type to be put prior to August or September, 1921.

There remains one question to be determined, and that is the question raised by the Commissioner's motion that plaintiff be required to defray certain traveling expenses amounting to some $250, incurred by the Commissioner in attending the taking of depositions on behalf of the plaintiff which were filed in the case. The Commissioner bases his right to require such payment upon the last sentence of section 4915 of the Revised Statutes (35 USCA § 63), which is as follows: "In all cases, where there is no opposing party, a copy of the bill shall be served on the commissioner; and all the expenses of the proceeding shall be paid by the applicant, whether the final decision is in his favor or not."

In support of his contention the Commissioner cites the case of Butler v. Shaw (C. C.) 21 F. 321. It does not appear from the report of this decision just what items embraced the costs that were allowed. Plaintiff maintains that he is under no obligation to pay the present bill, since the word "expenses" in section 4915 is to be considered as embracing only ordinary court costs, and not traveling expenses. The case of Clements v. Kirby (C. C. A.) 274 F. 575, is cited for this position as well as Butler v. Shaw, supra, but again, in Clements v. Kirby, it is not clear from the opinion just what items were included in the costs allowed. The court merely stated, at page 587 of 274 F., "The costs of this court and of the court below should go against Kirby." While the phrase "all the expenses of the proceeding" is admittedly very broad, in the absence of being referred to some precedent, other than the voluntary practice in cases of this kind, that it must be construed as intending to embrace traveling expenses, the Court is not disposed to adopt such construction. The narrower construction is certainly entirely reasonable and avoids possible abuse without, at the same time, doing any real injustice to the Patent Office, or imposing upon it expenses which it should not properly assume in the ordinary administration of the litigation passing through it.

In conformity with this opinion, a decree will be entered in favor of the plaintiff as prayed in the original bill of complaint, with respect to Cooper Black, application No. 6262, but the supplemental bill, with respect to the two other applications, will be dismissed.