Anthony J. CALI, Plaintiff,

v.

EASTERN AIR LINES, INC., Defendant.

No. 68 C 293.

United States District Court,
E. D. New York.

July 10, 1970.

Paul H. Blaustein, New York City (Sandoe, Hopgood & Calimafde, New York City, of counsel) for plaintiff.

John Vaughan Groner, Donald E. Degling and Fish and Neave, New York City, for defendant, Eastern Air Lines, Inc.

MEMORANDUM
and
ORDER

DOOLING, District Judge.

Defendant moves for summary judgment, Rule 56, on the ground that the invention of the patent in suit (U. S. Patent No. 3,265,290, 1964, 1966 to Cali) was in public use in this country more than one year prior to the date of the application for patent in the United States, 35 U.S.C. §§ 102(b), 282(2). The application was filed September 1, 1964. No issue of validity is presented at this time.

The invention related to JT4 jet engines used in Boeing 707 and Douglas DC 8 aircraft before the introduction of the fan-jet engine. Without detail—for it is not now relevant—the front-end low pressure compressor stage of the JT4 engines contains 7 "vane and shroud" assemblies in its 7 "stator" sections. The radially mounted stator blades are held in place at their outer ends by circular shrouds. At its after end the seventh stage vane and shroud assembly, or stator section, is loosely interconnected with a "fairing," a cylindrical segment that tapers inwardly aft and then flares out. In consequence of the high pressure at the after, outlet end of the seventh stator section and of the design looseness of the interconnection between the seventh stator section and the fairing, wear occurred during use at the interconnecting parts of the stator section and fairing which ultimately required repair. Three solutions offered, where replacement was not required. *First*, to build the worn parts back to approximate design dimension with weld and then machine them into design contour and dimension. *Second*, secure the fairing to the assembly with tie-rods or long bolts circumferentially spaced about the zone of treatment. *Third*, plaintiff's method of welding the fairing to the seventh stage vane and shroud—specifically, by circumferentially spaced welds across the outer surfaces of the facing rims of the fairing and stator section.

Plaintiff, then an employee of Pan American World Airways, filed his con-

ception with Pan Am as an employee suggestion on December 12, 1962. After describing the *first* method above, he proposed: "To permanently weld the fairing to the 7th stage vane & shroud. This will eliminate all of the above procedures." Plaintiff's supervisor noted on the suggestion, on the same date, that it was to correct excessive lug wear on 7th stage vane and shroud and on the fairing and would save about twenty-two man hours of work.

It is not disputed that plaintiff recovered from Pan Am a $500 suggestion award in October 1963 and a trip to Jamaica in March 1964. On May 28, 1964, Pan Am advised plaintiff that the Company did not desire to apply for a patent on the procedure and that plaintiff was free to do so, the Company reserving to itself royalty-free shop rights. On September 1, 1964, plaintiff applied for his patent.

There is no doubt that the patent claims are on a conventional axial flow compressor, in which the seventh stator section and the fairing are in or another way rigidly connected or secured at their marginal edge portion. So defined the invention was in use more than a year before the application was filed. The question is was the use "public use" within the meaning of 35 U.S.C. § 102(b).

The motion for summary judgment must be granted in defendant's favor.

Plaintiff's first disclosure of his patent in the Suggestion of December 12, 1962, described the wear problem and succinctly stated as the proposed method of dealing with it

"To permanently weld the fairing to the 7th stage vane & shroud."

The patent teaches (Col. 3, line 74 to Col. 4, line 6) that the wear

" * * * may be eliminated by fixedly joining the fairing 70 and stator section 46g to each other and in a manner which does not interfere with the assembly of the stator section, fairing and rotor section 30h. More particularly, a series of circumferentially spaced welds 76 is provided across the outer surface of rim 52 of the fair-

ing and the outer surface of rim 56 of the stator section between lugs 58."

The critical claim language is in Claim 1, " * * * a fairing having a front edge rigidly connected to the rear edge portion of an adjacent stator section * * *." Claims 3 and 4, dependent (as is Claim 2) on Claim 1, after specifying the lugs and slots in the shroud and fairing, add " * * * and means between said lugs and slots rigidly connecting said fairing and adjacent stator section to each other * * *." Claim 5, specifying only the 7th stage vane and shroud section and the fairing, puts the critical point in the words "a circumferentially extending marginal edge portion along said inlet end [of the fairing] secured to said marginal edge portion of said shroud * * *."

The invention, whether it was an unexpected, surprising and daring insight (for introducing rigidity may have been powerfully counter-indicated by engine building lore) or was an obvious expedient, was simplicity itself once it was conceived and expressed. And, in the generality of the claim language, the invention included the tie-bolt or tie-rod variant. Plaintiff, for perfectly sensible reasons, insists on the superiority of the weld method of securing the rigid connection, but both installations represent use of the invention.

Before September 1, 1963, Pan Am concededly used the weld form of the invention in three engines, the evidence is overwhelming that it used it in a fourth, and there is unrebutted evidence that it put other weld installations in use. At least one tie-rod installation was in use before September 1, 1963.

The problems and hesitations that preceded Pan Am's unrestricted use of the invention centered on three things, rivalry between the tie-rod and the weld techniques, difficulty in assembling the 8th stage rotor section when the weld technique was used, and consequential effects (*e. g.*, blade-tip rub, stator box cracking). The contest between the tie-rod and the weld was a tribute to the invention; it was not experimenting with rivals alternative to the invention, but

was test use of both to determine which form of the invention was better. The 8th stage rotor problem arose because the longish fairing is narrowest at its middle. The 8th stage rotor lies between the 7th stage vane and shroud and the fairing; if that shroud is first welded to the fairing, and the girth of the 8th stage rotor exceeds the narrowest diameter of the fairing (and it does), it is difficult to install the rotor from the fairing end. Plaintiff's solution (and it is not subject matter of his invention) was to tilt the rotor and snap it in against the yielding walls of the fairing (see patent Col. 4, lines 8 to 27). Another suggested way of slipping the 8th stage rotor into place was to heat-expand the fairing. But, of course, the tie-rods avoided the problem altogether, for they could be fastened into place after first the 8th stage rotor and then the fairing had been put in place; that, apparently, was a factor in keeping the tie-rod in the competition. The consequential effects problems are not well described, but it is clear that they could not be compensated by alteration in the indivisible concept of the invention.

In spite of the caution in introducing the invention into use, it was used in the power plants of commercial aircraft engaged in regular public air transportation commencing on February 14, 1963, when the tie-rod system was used in engine 610,612 installed in 'plane No. 727 as the No. 3 engine. The engines in which the welds and tie-rods rigidly connected the 7th stage stator section and the fairing were not put in non-revenue test-flight aircraft, or run to breakdown on a test-block. The engines were put in aircraft, and the engines were switched from aircraft to aircraft without any break in the rhythm of the engines' use in service before September 1, 1963. For example engine 610,712 was weld fitted and installed as the No. 2 engine in 'plane No. 715 on April 5, 1963; removed on June 26, 1963, after 845 hours in service, it was installed in 'plane No. 722 as No. 1 engine on June 29, 1963; removed on August 15, 1963, it was on August 17, 1963, installed in

'plane No. 720 as the No. 4 engine. It then had accumulated 1,350 hours of service. (It continued in 'plane No. 720 until December 1, 1963, when it had accumulated 2,457 hours of service.

The engine manufacturer, Pratt & Whitney, through its representative at Pan Am was aware throughout of the rigid-connection installations, and he kept Pratt & Whitney posted. No engine was installed with weld or tie-rod without Pratt & Whitney approval. It did not at once issue a blanket approval of welding or tie-rodding any and every engine showing the wear symptoms; it interposed no objection to starting on weld-use in a token number of engines, and to the use of tie-rods on a trial basis. Pratt & Whitney knew in June 1963 the working techniques used in welding the two sections at Pan Am (apparently getting it for relay to KLM in response to a supposed inquiry from KLM). When the Pratt & Whitney representative at Pan Am recommended going slow on blanket approval for welding on the basis of a good report on an engine with 600 hours of weld use (a report on an engine with 1,100 hours (later found to be 900 hours) of tie-rod use was in the immediate offing), Pratt & Whitney at first complied with that recommendation by saying that welding *all* 7th stages to their fairings was "not approved at this time" (adding that it was continuing "test here of tie strap repair"), but in a day or two it withdrew its objection provided there was no interference with 8th stage rotor blades in assembling the engine; it recommended holding the repair to a minimum number of engines pending evaluation of the tie-rod method which it thought better. That telegram was sent on August 1, 1963.

Under date of August 12, 1963, Pan Am established a part number for the sub-assembly comprising a seventh stage vane and shroud welded to a fairing, and under date of August 27, 1963, the Pan Am JT4A overhaul manual was supplemented to include the weld procedure as Method 2 and the tie-rod procedure as Method 1 for assembly.

That was by no means the end of the matter. For example, plaintiff did not receive a suggestion award until October 1963, and not until the end of the year did plaintiff consider that his weld technique had won substantial acceptance at Pan Am.

The statute is concerned with whether the invention was in public use. The invention here, is not a method of repair; the invention is, Claims 1–4, an axial flow compressor for a jet engine with two of its stages rigidly connected instead of being loosely interconnected, and, Claim 5, a combined stator section and fairing for an axial flow compressor for a jet engine. Such compressors containing such combined stator-fairing elements were in public use on commercial aircraft operated for profit by a scheduled commercial airline for months before September 1, 1963. The use was not experimental or developmental within the meaning of the cases that have found that certain public uses will not operate as a bar to patentability.

The use meets the classic tests of public use, Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071; Egbert v. Lippman, 1881, 104 U.S. 333, 336, 26 L.Ed. 755; Delemater v. Heath, 2d Cir. 1893, 58 Fed. 414, 416, and fails to come within the equally classic exception, Elizabeth v. Pavement Co., 1878, 97 U.S. 126, 134–135, 24 L.Ed. 1000. The record is replete with references to the use as being trial or test use or equivalent terms. The question is not what the use was called but what it was in quality and role. The use here was peculiarly of a kind that repelled any idea of experiment or of development. The rigidly connected sections, once installed in an engine and seated in a pod, passed, as their unit records show, into the confluent streams of jet engine life, to be switched from one aircraft to another, and in every way to carry on their standard power-plant jobs indistinguishably from any other engines. Their unit records taken with related papers disclosed their special construction and its occasion, and the welds or tie-rods were patent to any inspection. The use was not to aggregate empirical data to determine or guide the direction of modification of an emergent inventive concept. "Rigidly connect" was the specific genius of the invention and scarcely lent itself to that. What was under review was not the possible need for modification or variation in a complex of variable elements which were being united into a novel scheme of action, but choice between two methods of carrying out the simple and challenging principle of the invention and the adoption or rejection by the engine maker and user of that indivisible principle. The review was being made by protracted non-experimental public use of the completed invention free of any restriction whatever on Pan Am's use. In one sense it could be said that Pratt & Whitney and Pan Am were "experimenting" with the invention to see whether they would adopt it unrestrictedly, but in just that same sense one could as well say that an aircraft manufacturer might "experiment" with the use of Rolls-Royce engines in his air frames as against Pratt & Whitney engines: the "experiment," and the term would not be well used, would be the air-frame manufacturer's not Rolls-Royce's or Pratt & Whitney's, and it would not constitute an "experimental" use of the engines by the engine builder no matter how anxiously he followed the course of his engine's "trials." So here. Anxiety and concern over acceptance or rejection were plaintiff's lot while he waited for Pan Am and Pratt & Whitney to determine by protracted public uses of his invention whether they would or would not adopt it, but their use was not experimental or developmental in the evolution of the completed invention. Cf. Root v. Third Ave. Ry., 1892, 146 U.S. 210, 215–216, 225, 13 S. Ct. 100, 36 L.Ed. 946.

That plaintiff received no reward or profit is not in his situation relevant. He had communicated the whole of his concept to Pan Am in the expectation of a reward; the suggestion form plaintiff executed intimates company practice

and plaintiff's election to follow it. He put no restrictions on Pan Am's use of what he communicated. He did not and evidently could not control the time of their reduction of his concept to practice, or the time, extent and nature of their use of it. To all that Pan Am did he yielded his assent in advance—of course within limits of good faith dealing. *Cf.* Matarese v. Moore-McCormack Lines, 2d Cir. 1946, 158 F.2d 631. Pan Am, indeed, was the primary market plaintiff sought for his inventive concept, he transferred it to them, and he expected an award. Plaintiff did nothing that could be interpreted as eschewing exploitation of his invention until he, as inventor, had satisfied himself by a course of tests conducted by himself or by others that he had carried his concept to the point of mechanical finish at which it was ready for exploitation.

Certainly if the uses here involved had in their inception been manifestly experimental in the primary sense of the word, there would be a very great deal to say for plaintiff's argument that until November 1963 the issue lay open. The critical element here is that the first use in commercial flight of itself goes so far to rout every effort to characterize it as experimental. That was a use that within its own dimensions stood in contrast to a set of unranked alternative modes of exploring the utility and validity of the inventive concept which would at once invite the characterization of the set as "experimental" in the primary sense of that word (*e. g.*, test cell operation? Eastern Exhibit 24–C). But a use that occurs without limit of time and extends to use in the class of all revenue flights of any aircraft of Pan Am's that employs JT4 engines for motive power in any of the four engine positions without consequent restriction on the uses of the aircraft by reason of the installation is a use too refractory to accept the stamp of experiment almost from its very inception.

Accordingly, the motion for summary judgment must be granted. It is, therefore,

Ordered that the motion of defendant for summary judgment is granted and the Clerk is directed to enter judgment that plaintiff take nothing and that the action is dismissed on the merits with costs as taxed by the Clerk.