**Anthony J. CALI, Plaintiff-Appellant,**

**v.**

**EASTERN AIRLINES, INC., Defendant-Appellee.**

**No. 690, Docket 35374.**

United States Court of Appeals, Second Circuit.

Argued March 30, 1971.

Decided April 28, 1971.

Paul H. Blaustein, New York City (Sandoe, Hopgood & Calimafde, New York City), for plaintiff-appellant.

John Vaughan Groner, New York City, (Donald E. Degling, Fish & Neave, New York City, on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Cali, plaintiff and appellant in this patent infringement action, is a mechanic employed by one of the pioneers in the airlines industry, Pan American World Airways (Pan Am). The kernel of the patented invention which is the subject of this suit was contained in an idea which Cali submitted to Pan Am on a standard form soliciting employees' suggestions in December 1962. Although of course Eastern Airlines, Inc., the appellee and alleged infringer, seeks to minimize its value, Cali's proposal apparently resulted in the correction of a persistent defect in the design of the JT–4 jet engine, then used in Pan Am's Boeing 707 and Douglas DC–8 aircraft before the introduction of the fan jet. Cali's "suggestion-box" solution had eluded the industry's professional engineers.

The sole question raised on this appeal is whether the trial court properly concluded on the basis of the pleadings, affidavits, and depositions before it, that no material fact remained to be tried, thus justifying the grant of Eastern's motion for summary judgment. Judge Dooling, whose opinion is reported at 318 F.Supp. 474, decided that Cali's "invention was * * * in public use" and not used primarily for experimental purposes "more than one year prior to the date" Cali filed his application for a patent and hence the patent was invalid, 35 U.S.C. § 102(b). Accordingly, the action was dismissed. While Eastern may yet ultimately prevail on the question of prior use or on other defenses

raised below which are not before us on this appeal, we disagree with the district court that the relevant factual issues have been resolved with such clarity at this stage in the litigation as to justify summary judgment.

## I.

Cali applied for his patent on September 1, 1964. The key date for purposes of the "public use" bar of Section 102(b) is thus September 1, 1963. As will appear in more detail, the central question before us involves the nature and purposes of the uses to which Pan Am put Cali's invention prior to that date. Before we evaluate those uses, the contours of Cali's concept must first be sketched.

Cali's patent relates to the design of the front or low pressure compression section of the "axial-flow" compressor, the type of compressor used on the JT–4, manufactured by Pratt & Whitney Aircraft Division of United Aircraft Corporation (Pratt & Whitney). This front end section includes several cylindrical stages, consisting of alternating fan-like rotor sections sandwiched between stationary "stator" sections. Successive rotors blow air back against the blades (or vanes) of the stators (or shrouds), which in turn guide the air inward through the tapering compressor chamber to an outlet section called the fairing. The last, or seventh, stator on the JT–4 was designed by Pratt & Whitney so that it connected loosely to the fairing by means of lugs and slats. The loose interconnection permitted the "floating" fairing to vibrate against the seventh stator assembly, causing abrasive wear of the stator lugs and fairing.

As a mechanic employed by Pan Am since 1957, Cali became familiar with the usual practice of periodically repairing worn stators and fairings. This was done by first rebuilding the worn surfaces by welding them and then machining the rebuilt surfaces to their proper dimensions. Cali's suggestion, submitted to his supervisor in December 1962, proposed as an alternative to this practice "to permanently weld the fairing to the 7th stage vane and shroud" and thus by rigidly interconnecting them to eliminate the abrasive wear and hence the need for periodic repairs. Although this solution was "simplicity itself once it was conceived and expressed," as Judge Dooling characterized it, "introducing rigidity may have been powerfully counter-indicated by engine building lore," 318 F.Supp. at 475, primarily because of the danger of damage from stresses that might accumulate in the two vibrating assemblies.

While precise temporal relationships are unclear in many respects from this record, at approximately the time that Cali's suggestion was being evaluated, Pan Am engineers devised a variant application of the basic rigid-connection idea suggested by Cali's proposed weld technique. By this alternative method, the vibrating parts would be connected by means of long bolts or tie-rods. The tie-rod technique is conceded by both parties to be within the teaching of Cali's patent, whose critical language describes the two vibrating parts as being "rigidly connected" or secured. The primary advantage of the tie-rod variant appears to have been to permit easier assembly and servicing of the engine.

Both parties agree that Cali's suggestion initiated a period of indefinite length during which Pan Am, in the words of Eastern's brief, evaluated the rigid-connection concept at least with the object "of finding out whether the idea was worth using." Specifically, Judge Dooling identified three foci of "problems and hesitations that preceded Pan Am's unrestricted use of the invention." Thus, Pan Am was concerned with the relative merits of the weld and tie-rod methods. Second, as indicated above, the weld method caused difficulty in assembling the compressor (the solution finally hit upon for this problem, the details of which are irrelevant here, is included in Cali's patent). Third, the court referred to certain "consequential effects," such as cracking of the welded assembly which may have caused Pan

Am for a time to doubt the efficacy of Cali's approach. 318 F.Supp. at 475–476.

Certain essential details of this period prior to Pan Am's unreserved acceptance of Cali's concept, are not in dispute. Thus, by a telegram dated January 4, 1963, Pratt & Whittney authorized use of the tie rod on a "trial basis." Similarly, on February 8, 1963, Pratt & Whitney wired Pan Am that it had "no objection" to use of the weld "on token number of engines based on your assertion that no assembly difficulty will be encountered." Pursuant to this authorization,[1] Pan Am subsequently installed and used engines incorporating the tie rod technique on one engine and incorporating the weld approach on at least three other engines. In each instance, the engines were installed and used on commercial aircraft in the normal course of Pan Am's business.

## II.

■ The district court viewed each of these commercial uses as a "public use" within the meaning of Section 102(b), and this conclusion can hardly be challenged. That an invention or process employed in the regular conduct of a business is a "public use" for this purpose is a proposition settled long ago and never disturbed. Smith & Griggs Manuf. Co., 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887). See Electric Battery Co. v. Shimadzu, 307 U.S. 5, 20, 59 S.Ct. 675, 684, 83 L.Ed. 1071 (1939) (defining "public use" to include "the ordinary use of a machine or the practise of a process * * * in the usual course * * * for commercial purposes"); Egbert v. Lippmann, 104 U.S. 333, 26 L.Ed. 755 (1881). This settled concept of "public use" is "extraordinarily broad," Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342, 345 (1958) (Burger, Circuit

Judge). It is a matter of legal indifference that the "public" use may be necessarily concealed from public awareness by the structure of the design or the manner of its use, Hall v. Macneale, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1882); Egbert v. Lippmann, *supra;* Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2d Cir. 1946), cert. denied, 328 U.S. 840, 66 S. Ct. 1016, 90 L.Ed. 1615 (1946). Public use by a third party, with or without the knowledge or consent of the patentee, will generally defeat the patent as readily as public use by the inventor himself. Shaw v. Cooper, 32 U.S. (7 Pet.) 292, 8 L.Ed. 689 (1833); A. Schrader's Sons, Inc. v. Wein Sales Corp., 9 F. 2d 306, 308 (2d Cir. 1925). See Lorenz v. Colgate-Palmolive-Peet Co., 167 F.2d 423 (3d Cir. 1948).

We have previously explained the purposes of this sometimes harsh standard as intended "to require the inventor to see to it that he filed his application within [the statutory period] from the completion of his invention, so as to· cut off all question of the defeat of his patent by a use or sale of it by others more than [the statutory period] prior to his application" and as designed to avoid the "perplexing questions which must frequently arise when the intent of the user and the bona fides of the use are questions to be determined. * * * " Eastman v. Mayor, etc., City of New York, 134 F. 844, 854 (2d Cir. 1904). See Walker on Patents 700 (2d Ed. 1964). It is thus clear beyond cavil that Pan Am's use of Cali's invention in commercial aircraft prior to September 1, 1963, would defeat Cali's patent, were the uses not included within the "experimental use" exception to the prior use bar which we shall discuss below.

On the other hand, although the parties have not dwelt on the matter, it is

---

1. The tentative nature of the initial uses of Cali's idea at this early stage is indicated by two internal memoranda that passed between a Pan Am engineer, Frederick D. Curtin, and Pan Am's Inspection Department in February, 1963.

These memoranda refer to an impending "trial installation" of the tie rod and "a service test" of the weld method. The tie rod was expressly forbidden for use "on any other engines until the results of the service testing were known."

necessary to add that the present record would not appear to support a holding that *Cali's* action in submitting his suggestion to Pan Am constituted a "public use" regardless of the manner of Pan Am's subsequent exploitation of his idea. Cali did not conceal his invention from the public while using it to his commercial advantage more than a year before his application, thus extending the period of his monopoly beyond that protected by the patent laws. To prevent such an abuse and evasion of the patent laws seems to have been accepted by courts as an important purpose of the "public use" bar, see Watson v. Allen, *supra,* 254 F.2d at 346; Koehring v. National Auto Tool Co., 362 F.2d 100, 103 (7th Cir. 1966); Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., *supra,* 153 F.2d at 520, but one which has little importance in the circumstances of this case. Cali does not appear to stand in the position of an inventor who sells his patented device in the ordinary course of his business, for a predominantly commercial purpose, and without restriction or control over the uses to be made of the invention by the buyer. In such a case, the *buyer's* acts and purposes become irrelevant since the inventor's sale of the device is itself sufficient to defeat the patent. See Tool Research & Engineering Corp. v. Honcor Corp., 367 F.2d 449 (9th Cir. 1966), cert. denied, 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972 (1967).

Eastern does stress the absence of any indication in this record that Cali attempted to control or in any way limit Pan Am's use of his idea. Similarly, the district court observed that Cali "put no restrictions on Pan Am's use" nor did he or *could* he "control the time * * * extent and nature of [Pan Am's] use" of his conception. 318 F. Supp. at 478. But the absence of any control by Cali, or any attempt to impose control, should not be elevated to

the status of a per se test under the circumstances disclosed here and in the posture in which we receive this case. Cali lacked the means to develop his idea on his own resources byond the bare conception of it. See Ry. Register Manuf. Co. v. Broadway & 7th Ave. Ry., 22 F. 655 (2d Cir. 1884); Harmon v. Struthers, 57 F. 637 (W.D.Pa.1893). Nor was Cali, as an employee of Pan Am, in any position to dictate or even propose the terms of Pan Am's entirely gratuitous application of his concept. See General Electric Co. v. Continental Fibre Co., 256 F. 660, 663 (2d Cir. 1919). No purpose consonant with the scheme of the patent laws would be served were the statutory "public use" period to run in every case from the time that an employee communicated a raw idea to his superiors for evaluation and exploitation in their unfettered discretion. Indeed, such a doctrine might stifle inventiveness. See Note, The Public Use Bar to Patentability: Two New Approaches to the Experimental Use Exception, 52 Minn.L.Rev. 851, 855–56 (1968).

We do not imply that an inventor in Cali's situation might sell an idea to his employer and thereafter manifest no interest in the development, success, or failure of his invention, and yet take advantage of his employer's trial or experimental period. Such inaction and indifference would indicate that the inventor's intent was commercial—to secure the reward for the submission of the submitted concept, whatever its value—and not experimental, and would therefore constitute a "public" and non-experimental use within the meaning of Section 102(b). Cali's acceptance of a financial reward for his idea, however, *after it was examined, tried, and ultimately adopted by Pan Am,* is consistent with a purpose to follow the idea through to its ultimate perfection and fate.[2] Moreover, we do not see the purposes of the patent laws enhanced were

---

2. We do not imply that acceptance of an award upon submission of an idea would necessarily be *inconsistent* with a primarily non-commercial purpose or would

necessarily evidence the inventor's lack of a continuing interest in the progress of the invention.

the public use period to run from the date of submission, assuming Cali at that time and thereafter continued to maintain an interest in the progress of his suggestion, merely because Cali's inventiveness and thereafter his interest in the invention may have been whetted by the possibility of a financial reward should the concept prove useful to Pan Am.

Eastern does not now contend that Cali ever abandoned his idea to Pan Am in the sense suggested by the preceding paragraph. In any event, the evidence that Cali remained interested in the progress of his idea until and beyond the time it was unreservedly accepted by Pan Am is more than sufficient for purposes of our review of a grant of summary judgment. Accordingly, the determinative question becomes the nature and purpose of Pan Am's use of Cali's idea, as the parties and district court apparently seemed to agree.[3]

### III.

■ We turn to the issue principally briefed and argued, *viz.*, whether Pan Am's public use of Cali's invention prior to September 1, 1963 falls within the judicially created exception to the "public use" bar for uses which are shown by "full, unequivocal, and convincing" proof, Smith & Griggs Manuf. Co., 123 U.S. 249, 264, 8 S.Ct. 122, 31 L.Ed. 141 (1888), to have been primarily intended as experimental rather than commercial. Aerovox Corp. v. Polymet Mfg. Corp., 67 F.2d 860 (2d Cir. 1944). Specifically, the question is whether this factual issue was resolved by the papers before the district court with sufficient clarity to permit an award of summary judgment.

At the threshold, we differ with the district court's interpretation of the scope of the "experimental use" exception. Judge Dooling appears to have believed that even Pan Am's "first use" of the tie rod and weld was not predominantly experimental even assuming that the primary purpose of the use was to determine whether Cali's idea should be adopted or rejected. Apparently the district court assumed that a use may not be "experimental" if the purpose is to see if the idea in question has any value at all, rather than to explore ways of improving the invention or "to determine or guide the direction of *modification* of an *emergent* inventive concept." 318 F.Supp. at 477 (emphasis added). The district court appears to have equated "experimental" with "developmental." *Id.*

This conception of the scope of the experimental use exception apparently underlay the whole of the district court's decision. We find it unduly restrictive. We see no good purpose in attempting to distinguish sharply between experimentation with an eye to going "back to the drawing board" for modification and rethinking in the event of initial failure on the one hand and experimentation directed more toward discovering whether a novel invention should be adopted and marketed or discarded in its entirety. Indeed, we have previously said as much in Aerovox Corp. v. Polymet Mfg. Corp., 67 F.2d 860, 862 (2d Cir. 1933) where we "assumed" that an inventor may experiment with an idea "not only to put

---

3. That the appropriate test here is the purpose of Pan Am's use of Cali's idea, may appear at first to be inconsistent with the leading case defining the "experimental use" exception to the public use bar, Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000 (1877). In the *Pavement* case, the experimenter laid down seventy-five feet of his newly designed pavement on a public road adjoining a toll house. In finding that the commercial use of the pavement was subordinate to its experimental use, the Court focused on Nicholson's purposes, and not those of the public in permitting use of the road. However, Nicholson, the inventor in *Pavement*, unlike Cali, was able to and did in fact closely supervise and control the use of his invention. Here, it would have been unrealistic and inconsistent with the purposes of the patent laws to require that the inventor maintain control; accordingly, the decisive purpose necessarily becomes that of the party to whom control is transferred.

it into definitive form, but to see whether his ideas are worth expoiting."

The leading case defining the reach of the experimental use exception, Elizabeth v. Pavement Co., 97 U.S. 126, 24 L. Ed. 1000 (1877) involved experimentation to test the *durability* of the inventor's new kind of pavement. There was no indication that the inventor put the pavement to the test of six years' public wear to determine what improvements he might make, rather than simply to discover whether the idea was worth pursuing. Indeed, the Court's decision in favor of the patentee was premised on the assumption that the aim of the test might be "to bring his invention to perfection, *or* to ascertain whether it [would] answer the purpose intended." 97 U.S. at 137 (emphasis added). Either sort of experimental use—if indeed any such sorting is tenable—would bring the invention within the experimental use exception because "it is the interest of the public, as well as [of the inventor] that the invention should be perfect *and* properly tested. * * *" *Id.* (Emphasis added.)

## IV.

The crucial date therefore becomes that when Pan Am first publicly used Cali's concept with a predominantly commercial intent, rather than with the primary purpose of determining whether or in what form the idea should be put into general use.

On this review of the summary judgment, the issue is more properly phrased as being whether Cali has succeeded by other than "vague allegations," Dressler v. M. V. Sandpiper, 331 F.2d 130 (2d Cir. 1964), in raising a "genuine issue," F.R.Civ.P. 56(c) as to whether Pan Am's first public and non-experimental use of Cali's concept occurred on or subsequent to September 1, 1963. We have recently had occasion to admonish courts in this jurisdiction to approach summary judgment with less trepidation than had sometimes been displayed in the past, Dressler v. M. V. Sandpiper, *supra.* But to recognize that the purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see if there is a genuine need for trial," *id.* at 132 (quoting Advisory Committee note on 1963 amendments to F.R.Civ.P. 54) does not entail abandoning the "fundamental maxim that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried." American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d Cir. 1967). See Empire Electronics v. United States, 311 F.2d 175, 179–180 (2d Cir. 1962). Moreover, when the court grants summary judgment, it must resolve all ambiguities and draw all reasonable inferences favorable to the party against whom summary judgment is sought, United States v. Diebold, 369 U. S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), bearing in mind that the moving party has the burden of showing an absence of any material factual issue for trial, Adickes v. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). If undisputed evidentiary facts disclose competing material inferences as to which reasonable minds might disagree, the motion must be denied. Lemelson v. Ideal Toy Corp., 408 F.2d 860 (2d Cir. 1969). "This admonition should especially be kept in mind when the inferences which the parties seek to have drawn deal with questions of motive, intent, and subjective feelings and reactions." Empire Electronics Co. v. United States, *supra,* 311 F.2d at 179–180. See also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); White Motor Co. v. United States, 372 U.S. 253, 259–260, 83 S.Ct. 696, 9 L.Ed. 2d 738 (1963); Consolidated Elec. Co. v. United States ex rel. Gough Indus., 355 F.2d 437 (9th Cir. 1966); Levin v. Jt. Comm'n on Accreditation of Hospitals, 122 U.S.App.D.C. 383, 354 F.2d 515 (1965); Vermont Strucutural Slate Co. v. Tatko Bros. Slate Co., 233 F.2d 9 (2d Cir. 1956) (suggesting that for this reason district courts might exercise special

caution before granting summary judgment in patent cases).

Applying these familiar standards to this record, we conclude that the motion for summary judgment should have been denied.

A recitation of each element of the evidence relied on by Eastern to sustain its summary judgment would serve no useful purpose. It is sufficient to indicate the "specific facts" set forth in the documents before us which show that there is a "genuine issue for trial." F. R.Civ.P. 56(e). Thus, apart from the bare use of the tie rod or weld on four aircraft in the normal course of Pan Am's business prior to September 1, 1963, Eastern relies on evidence that (1) on April 4, 1963, Pan Am issued an amendment to its overhaul manual explaining the tie-rod method; (2) on June 19, officials of Pan Am answered a request from the Royal Dutch Airlines by describing in detail the weld operation; (3) on August 1, Pratt & Whitney authorized Pan Am to proceed with further weldings; (4) and on August 27, Pan Am issued a further amendment to its overhaul manual incorporating both the weld and tie rod methods of repairing worn JT-4 compressors. But against this, Cali points to internal Pan Am memoranda and telegrams from Pratt & Whitney expressly referring to impending uses on commercial aircraft as "tests" or the like.[4] Also, on July 27, Claude G. Newton, an engineer for Pratt & Whitney, wired the Pratt & Whitney Service Department that the welding technique presented assembly problems and advised Pratt & Whitney to "go slow on granting official approval" of the weld. On July 30, Pratt & Whitney sent a telegram to Pan Am expressly disapproving the weld technique because of insufficient experience with it. Al-

though its August 1 telegram, on which Eastern relies, did evince a less hostile attitude toward the weld, Pratt & Whitney still recommended that the use of the technique "be held to a minimum." There was evidence that the weld technique continued to create problems with assembling the compressor into September, 1963, and Cali was not rewarded for his successful innovation until October, 1963.[5]

In sum, we find that the record discloses a genuine issue of fact as to whether Pan Am publicly used Cali's invention prior to September 1, 1963, for predominantly non-experimental purposes.

Reversed.

---

4. *See* note 1 and accompanying text, *supra.*

5. An "Investigator's Report" dated October 7, 1963, reported that the weld procedure "has been adopted and incorporated into the overhaul manual." An award of $500 for Cali was recommended. Cali subsequently received both the $500 and

a trip to Jamaica. In May, 1964, Pan Am told Cali that he was free to apply for a patent, since Pan Am did not desire to do so. A condition to this was that Pan Am retained royalty free shop rights in Cali's welding procedure. Eastern incorporated the weld procedure into its repair manual on December 9, 1964.