CELESTRON PACIFIC, Plaintiff,

v.

CRITERION MANUFACTURING CO.,
INC. and Robert Goff, Defendants.

CELESTRON PACIFIC, Plaintiff,

v.

CRITERION MANUFACTURING CO.,
INC., Defendant.

Civ. A. Nos. 15872, N–74–276.

United States District Court,
D. Connecticut.

Dec. 4, 1978.

F. Eugene Davis, IV, Mattern, Ware, Davis & Stoltz, Bridgeport, Conn., Ira G. Grudberg, Jacobs, Jacobs & Grudberg, New Haven, Conn., Joseph F. Troy, Troy, Malin, Loveland & Letts, Los Angeles, Cal., David H. Semmes, Sharon, Pierson, Semmes, Crolius & Finley, Washington, D. C., for plaintiff.

J. Weston Maher, Hartford, Conn., for defendant Goff.

Peter L. Costas, Henry Ramenda, Hartford, Conn., for defendant Criterion.

## RULINGS ON DEFENDANT CRITERION'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

ZAMPANO, District Judge.

On October 3, 1973, the plaintiff Celestron Pacific (hereinafter "Celestron") instituted Civil Action No. 15,872 against the defendants Criterion Manufacturing Co., Inc. (hereinafter "Criterion") and Robert Goff, a former employee of Celestron and presently an employee of Criterion. In its six-count complaint, Celestron essentially contends that certain confidential information and trade secrets relating to the manufacture and sale of Schmidt corrector plates and mirrors, utilized in Schmidt telescopes and cameras, were improperly disclosed by Goff and unlawfully appropriated by Criterion, as a result of which Celestron seeks declaratory and injunctive relief and money damages.

Subsequently, on November 19, 1974, Celestron commenced a second action against Criterion, Civil Action No. N–74–276, requesting injunctive and other relief based upon Criterion's alleged infringement of Celestron's U.S. Patent 3,837,124 and its U.S. Patent 3,837,125 (hereinafter "125 patent). Thereafter the pleadings were amended to include a claim of infringement with respect to Celestron's U.S. Patent 3,889,431 (hereinafter " '431 patent), as a continuation-in-part of its earlier '125 patent.

In response to these lawsuits, Criterion filed a series of defenses and counterclaims, including a claim that the '125 and '431 patents were in public use in this country more than one year prior to the dates of the applications for the patents and hence the patents are invalid under the provisions of 35 U.S.C. § 102(b). The "public use" defense with respect to these two patents has been placed in issue in Civil Action No. 15,872 by reason of Criterion's Fifth Counterclaim and in Civil Action No. N–74–276 by way of the defenses pleaded and the First Counterclaim.

On the basis of the pleadings, answers to requests for admission of facts, depositions and other moving papers, Criterion now moves for partial summary judgment on the question of prior use in both actions. After Criterion filed its motions for summary judgment, Celestron sought to withdraw the '125 and '431 patents claims from its lawsuits, but since Criterion insists the issues be resolved under its counterclaims, the parties have filed extensive briefs and oral arguments have been held. The issues presently ripe for decision are whether the products in question were "in public use or on sale" prior to the dates of the applications for the patents within the meaning of 35 U.S.C. § 102(b), and, if so, whether an experimental motivation for the sales saves the patents from the statutory bar.

I

According to the moving papers, the plaintiff's president and owner, Thomas J. Johnson, was trained as an electrical engineer and organized the plaintiff in 1964 and a sister company to manufacture electronic equipment, with particular attention to the construction of a number of telescopes. Mr. Johnson determined that one type of telescope which was very desirable for amateur use was known as a Schmidt Cassegrain. However, this telescope required the manufacture of Schmidt corrector plates, which according to the methods then known, was

difficult, expensive, and time-consuming. Thereupon Mr. Johnson proceeded to develop and patent certain techniques which he believed would lead to the commercially profitable production of Schmidt Cassegrain telescopes.

On September 4, 1973, Mr. Johnson, with the plaintiff as assignee, applied for the '125 patent entitled "Method And System For Making Schmidt Corrector Lenses." The patent discloses and claims a technique for producing the corrector lens from a contour block master which has the inverse curve of that desired for the corrector plate on its upper surface, so as to provide a master glass template. A thin glass workpiece is placed under vacuum on the master glass template in an intimate glass-to-glass contact with the curved surface of the glass template. The workpiece and glass template are then rotated together while the upper surface of the workpiece is ground and polished to a uniform accurate flatness. When the vacuum is removed, the glass springs back and the upper surface assumes the desired Schmidt corrector curve.

On September 23, 1974, Mr. Johnson, with the plaintiff as assignee, applied for the '431 patent entitled "Method For Making Schmidt Corrector Lenses." The '431 patent is a continuation-in-part of the '125 patent and states that it is a method for forming the master glass template used in making Schmidt corrector plates of the type used in Schmidt Cassegrain telescopes. The technique involves mounting a test piece upon a previously ground master glass template by means of a vacuum, grinding the exposed surface flat, removing and testing the piece, and marking off excess areas of glass on the piece. At this point, Claim 1 then states that the "test piece" is ground and polished to remove residual errors. However, Claim 1 should have read that the "glass block" (and not the "test piece") is further figured to produce a master glass template. This and other admitted errors in the Claims caused the plaintiff on February 23, 1976, to file for a reissue of the patent. The proceedings before the Patent Office on the reissue are currently still in progress.

## II

Criterion first contends that the '125 patent is invalid on the ground that the invention was "in public use" more than one year prior to September 4, 1973, the filing date of the application which resulted in the issuance of the patent.

The pertinent portion of 35 U.S.C. § 102(b) provides:

A person shall be entitled to a patent unless . . . the invention was . . in public use or on sale in this country, more than one year prior to the date of the application for patent . . .

The policy consideration underlying the rule is to prevent the extension of the period of monopoly permitted under the patent laws by requiring the inventor to make a timely application so that the patent period will commence to run without undue delay. *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 520 (2 Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946); cf. *Timely Products Corporation v. Aaron*, 523 F.2d 288, 301 (2 Cir. 1975); *Cataphote Corporation v. De Soto Chemical Coatings, Inc.*, 356 F.2d 24, 25 (9 Cir.), cert. denied, 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966).

At the time Criterion originally filed its Motion For Partial Summary Judgment with respect to the '125 patent in 1975, the record overwhelmingly established that the method of the '125 patent as set forth in the eleven Claims thereof was in commercial use more than one year prior to the filing of the application which matured into the '125 patent. In its responses to Criterion's requests for admission, Celestron admits that the techniques set forth in the invention were all in use in the regular commercial manufacturing of Schmidt corrector plates several years prior to 1972. Requests 8–25 employ directly or paraphrase the language of each of the Claims, to which Celestron admits commercial utilization of these processes prior to the critical date. In addition, Mr. Johnson in his deposition taken on June 16, 1975, admitted that the procedures

specified in the '125 patent were utilized in production by his company as early as 1968 and that, although he had been "thinking about" filing for a patent since 1964, he decided to patent his process only when one of his employees, Robert Goff, left for employment with Criterion in 1973. (Johnson Deposition at 47–50).

In the face of this conclusive evidence supporting the "public use" bar to patentability within the meaning of § 102(b), Celestron initially defended on the ground that the prior use "was at all times carefully guarded by plaintiff as a trade secret." After it became evident that the "trade secret" defense lacked merit under the principles enunciated in *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, supra, Celestron was given the opportunity to file additional memoranda and affidavits to counter Criterion's allegations of prior use.

As a consequence, Celestron for the first time now advances the claim that all prior usage of the patented process for the manufacture of Schmidt Cassegrain telescopes was experimental and thus falls within an exception to the public use bar of § 102(b). See, e. g., *Smith & Griggs Mfg. Co. v. Sprague*, 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141 (1888); *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 137, 24 L.Ed. 1000 (1877); *Cali v. Eastern Airlines, Inc.*, 442 F.2d 65, 70 (2 Cir. 1971). In his affidavit, Mr. Johnson contends that:

1. The commercially profitable manufacture and sale of telescopes required a high quality Schmidt corrector plate.

2. In obtaining the plate it was necessary to draw a vacuum between the work piece and a glass master in order to have a true glass-to-glass contact over the entire mating surface of the master.

3. Prior to 1973, he used a jet air stream to avoid minute dust particles from settling on the freshly cleaned surfaces of the glass. However, glass-to-glass contact was not achieved because the combination of imperfect cleaning techniques and vapor condensation caused by the air jet stream resulted in a thin film of contaminant always being present at the interface of the work piece and the glass master.

4. Consequently, prior to 1973, the telescopes manufactured and sold were optically defective, very costly, and must be considered "experimental" devices.

5. In mid-1972, he finally discovered a technique capable of establishing true glass-to-glass contact over the entire mating surface. This was accomplished by putting a sheet of lint-free tissue paper over the freshly cleaned master surface, placing the cleaned work piece on the combination of master and tissue, and then withdrawing the tissue.

6. Commencing in 1973, a sales program was initiated to exploit commercially the perfected and patented process. Thus, Celestron argues, questions of fact exist which must be resolved by the fact finder at trial rather than by way of summary judgment. *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 288 (5 Cir.), cert. denied, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974); *Cali v. Eastern Airlines, Inc.*, supra, 442 F.2d at 71–72; cf. *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2 Cir. 1975).

It is settled law that even though an invention falls within the provisions of § 102(b) by being in public use or on sale more than one year prior to the filing of the patent application, such use or sale will not invalidate the patent if it was primarily for experimental purposes. *Smith & Griggs Mfg. Co. v. Sprague*, supra, 123 U.S. at 256, 8 S.Ct. 122; *In re Yarn Processing Patent Validity Litigation*, supra, 498 F.2d at 277. A reasonable period of experimentation is legally permitted for the inventor to perfect what he has conceived or to determine whether his invention answers the purpose intended. *City of Elizabeth v. American Nicholson Pavement Co.*, supra, 97 U.S. at 137.

However, it is also well established that the claimed period of experimentation cannot "exploit the invention and gain a

competitive advantage over others." *Solo Cup Co. v. Paper Machinery Corp.*, 240 F.Supp. 126, 131 (E.D.Wis.1965), modified on other grounds, 359 F.2d 754 (7 Cir. 1966), quoted with approval in *Pickering v. Holman*, 459 F.2d 403, 406 (9 Cir. 1972); see also *Super Mold Corp. v. Clapp's Equip. Div., Inc.*, 397 F.2d 932, 933 (9 Cir. 1968); *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 404 F.Supp. 1295, 1297 (N.D.Miss.1975), aff'd, 569 F.2d 286 (5 Cir. 1978). As stated in *Smith & Griggs Mfg. Co. v. Sprague*, supra, 123 U.S. at 256, 8 S.Ct. at 126:

> A use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principle, and not the incident, must give character to its use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized and substantially for the purposes of [the] experiment.

See also *Dart Industries, Inc. v. E. I. Du Pont De Nemours & Co.*, 489 F.2d 1359, 1364–1365 (7 Cir. 1973), cert. denied, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974).

■ Applying these principles to the uncontroverted facts in the case sub judice, it is the Court's opinion that the public use and completed sales of the '125 patent for several years prior to the critical date establish conclusively that the statutory bar of § 102(b) must apply. The general, conclusory allegations set forth in the moving papers filed by Celestron to support its "eleventh hour" experimental use claim fail to present a controversy on any genuine issue of material fact which would alter the Court's conclusion. Cf. *S. E. C. v. Research Automation Corp. et al.*, 585 F.2d 31 (2 Cir. 1978).

As mentioned hereinbefore, the admissions under oath, in deposition testimony, and in answers to Requests for Admission, amply disclose the requisite prior commercial use and sales to be "in public use or on sale" within the meaning of § 102(b). When asked, with reference to the '125 patent, whether in fact "all the telescopes which you made and sold from 1966 and thereafter employed the process steps set forth in these claims," Mr. Johnson replied, "Essentially, correct." (Johnson Deposition at 965). Moreover, the sales were not isolated ones to select customers for the purpose of testing the demand and workability of the invention; rather, there was a large number of completed sales to a wide range of customers. For example, prior to one year before the patent application was filed, Celestron sold over 1,000 Schmidt Cassegrain telescopes having corrector plates made by the process disclosed in the '125 patent. In the years ending June 30, 1971 and June 30, 1972, there were gross sales amounting to $418,949 and $601,411, respectively, the majority of which involved purchases by customers of the Schmidt Cassegrain telescopes. Thus, it is evident Celestron had on hand prior to the critical date a substantial inventory of the completed product for the purpose of selling in commercial quantities.

Reasonable minds cannot differ with respect to the inventor's and his company's motivation and intent. In advertising prior to 1972, there are numerous references extolling the completeness and superiority of the products in question. Various governmental agencies received sales proposals from Celestron stating that the Schmidt Cassegrain telescopes were "optically superior to all others" and available to the market place "only after the perfection of a production technique of inexpensively reproducing high-accuracy Schmidt corrector plates." (Ex. DXMMMM). The sales were unqualified; the customers were neither informed that the product was an "experimental" one nor requested to make any type of report to Celestron which might effect a change in the process which had been reduced to practice. Mr. Johnson's

mere conclusory allegation that the production and sales of the telescope·prior to the critical date were "experimental" in nature is insufficient to foreclose the application of the "public use or on sale" bar of the statute.

Finally, there is no merit to Celestron's claim that the invention was in experimental stages until the "discovery" in mid-1972 that the use of lint-free tissue achieved predictable glass-to-glass contact and, therefore, it was only thereafter that the product was ready for profitable commercial exploitation. The record clearly discloses that prior to the critical date some profits on the sale of the Schmidt Cassegrain telescopes were realized by. the plaintiff. In any event, the claim is insufficient as a matter of law because the specifications set forth in the '125 patent fail to mention the use of lint-free tissue to obtain true glass-to-glass contact. In his deposition, at page 802, Mr. Johnson agrees that the Claims of the '125 patent make no reference to the use of lint-free tissue. Thus, it is obvious that, even assuming the crucial nature of the 1972 "discovery," the patent would be invalid because the description· of the invention does not disclose the "best mode" contemplated by the inventor, contrary to provisions of 35 U.S.C. § 112, which in pertinent part requires that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use 'the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

See also *Dale Electronics, Inc. v. R. C. L. Electronics, Inc.*, 488 F.2d 382, 389 (1 Cir. 1973); *Indiana General Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 439 (S.D.N.Y.1969), aff'd, 421 F.2d 1023 (2 Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970); *Benger Laboratories Ltd. v. R. K. Laros Co.*, 209 F.Supp. 639, 644 (E.D.Pa. 1962), aff'd per curiam, 317 F.2d 455 (3 Cir.), cert. denied, 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963).

### III

█ It is not disputed that the Claims of the '431 patent are in error and do not accurately reflect the invention defined in the specification. As such, it is not a valid, enforceable patent. However, even assuming the errors are corrected as anticipated by the plaintiff through a reissue of the patent, 35 U.S.C. § 251, the '431 patent, as a continuation-in-part of the '125 patent and containing essentially all the corresponding claims of the '125 patent, must also be deemed to be within the statutory bar of 35 U.S.C. § 102(b) for the reasons previously advanced.

### IV

█ In granting the defendant's motions for partial summary judgment, the Court is cognizant that such motions should rarely be granted in patent cases, particularly where the "experimental use" exception to the "public use or on sale" bar of § 102(b) is invoked. See, e. g., *Cali v. Eastern Airlines, Inc.*, supra, 442 F.2d at 71–72; *In re Yarn Processing Patent Validity Litigation*, supra, 498 F.2d at 288. On the other hand, summary judgment is appropriate in patent cases where there is no genuine issue of fact to be resolved at trial, or where the evidence presented in support thereof would compel the direction of a verdict. See, e. g., *Dart Industries, Inc. v. E. I. Du Pont De Nemours & Co.*, supra; *Super Mold Corp. v. Clapp's Equip. Div., Inc.*, supra; *Magee v. Coca-Cola Company*, 17 F.R.D. 10 (N.D.Ill.1955), aff'd, 232 F.2d 596 (7 Cir. 1956). In this case, the Court is convinced that the defendant's motions for partial summary judgment must be granted on the grounds that there is no genuine issue of material fact, and that the defendant's evidence of prior use and sale within the statutory bar of § 102(b) is strong, clear and convincing, and established beyond a reasonable doubt.

Accordingly, judgments shall enter granting defendant's motions for partial summary judgment.